375 So.2d 476 (1978)
Willie Lewis MACK
v.
STATE.
3 Div. 869.
Court of Criminal Appeals of Alabama.
July 25, 1978.
Rehearing Denied August 29, 1978.
After Remandment January 30, 1979.
Rehearing Denied February 26, 1979.
*479 J. L. Chestnut of Chestnut, Sanders & Sanders, Selma, for appellant.
William J. Baxley, Atty. Gen. and James F. Hampton, Asst. Atty. Gen., for the State, appellee.
HARRIS, Presiding Judge.
Appellant was convicted of murder during the course of a robbery in which the victim was intentionally killed by appellant. The jury returned a verdict finding the defendant guilty as charged in the indictment and fixed his punishment at death. Throughout the trial proceedings he was represented by Court-appointed counsel who represents him on this automatic appeal. The case went to the jury on pleas of not guilty and not guilty by reason of insanity.
Prior to arraignment appellant filed eleven pretrial motions. All of these motions were filed on the same date and the trial court set a date to take testimony, hear arguments, and rule on each motion. Briefly, the motions are as follows:
1. To suppress defendant's statements.
2. To quash indictment because of discrimination in jury selection.
3. To inspect, examine and test physical evidence.
4. For information necessary to receive a fair trial.
5. To quash jury venire.
6. To sequester jurors during voir dire.
7. To suppress evidence.
8. To quash indictment because statute unconstitutional.
9. To challenge composition of petit jury.
10. Challenging "death qualifications" voir dire questions.
11. To compel disclosure re: tangible evidence.
The State filed answers to each of these motions and denied most of the allegations, admitted a few, objected to many on the ground that appellant was not entitled to the information sought, and moved that the motions be stricken or denied.
Appellant did not take up these motions in the order in which they were filed but took up the motion to quash the jury venire before going to the other motions. We will treat the motions in the order they were presented to the trial court.
The first witness called by appellant on the motion to quash the jury venire was Honorable Jesse O. Bryan, District Attorney of Butler County, Alabama.
In sum, he testified that he had been District Attorney since 1969 and since that time he had assisted the grand jury about twenty times including two or three special grand juries. He stated that the population of Butler County is approximately thirty *480 percent black and seventy percent white. He said he has not known of a black being foreman of a grand jury but knows that blacks served as foremen on two petit juries during his tenure of office.
He further testified that women served as foremen of grand juries on two occasions that he could definitely recall. He stated that he had never registered a complaint with the jury commissioners as to the composition of the jury rolls and jury box of Butler County since he took office, and that he had not noticed any radical change in the makeup of the grand and petit juries in the past five years. He does not strike the jury panel for the trial of cases but assigns that duty to the Assistant District Attorney. He said the three jury commissioners were white and he had never known a black to be appointed to the Jury Commission of Butler County.
He stated he showed the present commissioners the several motions filed by appellant's counsel so that they would know what was alleged in the various motions.
John S. Andrews, Assistant District Attorney, was called by appellant as a witness on this motion to quash the jury venire.
He testified that he was County Solicitor of Butler County in 1970 and continued in that capacity until January, 1977, when he became Assistant District Attorney by operation of law. He stated that he has been striking juries in Butler County since 1970 and has not noticed any drastic or great changes in the composition of the jury venires during that period of time. He does not attend the sessions of the grand juries.
He further testified that he knew the jury commissioners but he had never had any conversations with them concerning the grand or petit juries; that he had not discussed with the commissioners the various motions filed by appellant in this case. He stated he did not know the population of Butler County in terms of raceblack and white.
Mr. Ed Phillips, a jury commissioner, testified that he was 78 years of age and lived on Route 3, Georgiana, Butler County, Alabama. He was appointed to the commission by the Governor and had served for the past fifteen years. He testified that Mr. Zell Pope was the Chairman of the Jury Commission. He stated it was the duty of the commissioners to visit every beat in the county seeking qualified persons for jury duty and that they did not discriminate against anyone, blacks or whites, women or age groups from 19 years of age to 65 years of age. He did testify that most of the 19 year olds were still in school and were out of the county and he understood they had to live in Butler County. He further stated they tried to get as many qualified persons just under 65 years of age because most of the 65 year old people would claim their exemption and this would cost the county unnecessary money. He stated that the week before this case was set he went into four beats in the Eastern part of the county with the Clerk of the Jury Commission along with Mr. Jimmy Willis, who was to become the new Clerk, and asked people to give them the names of qualified persons for jury service and they got the names of forty or fifty persons they considered were fit for jury duty from one beat. He said they were careful in selecting good citizens for jury duty and did not even consider putting drunkards and rogues on the jury roll.
Mr. Phillips further testified they would use the poll list which was published in the county newspaper and compare the poll list with the jury roll book to see if the names were in the roll book. Sometimes they would contact persons who said they were not registered voters, and, therefore, could not serve on the jury. Such persons were told that they were not disqualified from jury duty because they were not registered voters and their names would be put on the jury roll and in the jury box. In scanning the jury roll if they came to the name of a person who was dead they would remove that person's name from the jury roll and the jury box. If they found a name on the voting list and that person was not on the jury roll, they would put his or her name on the book and into the box.
*481 Mr. Sam Owens, a member of the Jury Commission for five years, testified he had served on the Jury Commission for five years. He said he would travel in the beats in the western part of Butler County, and the Jury Commission would visit the various beats once a year in quest of qualified persons to serve on the jury. He would contact responsible people in the community and get the names of persons considered qualified for jury service and bring the list to the Clerk of the Jury Commission. All the commissioners would meet and go over the list before the names were put on the jury roll and in the jury box; that the last trip he made was in the fall of 1977 and he spent several days interviewing prospective persons to serve on the jury.
He further testified that he had a couple of black school teachers who helped him get the names of black males and black females who were qualified for jury service. One of the black school teachers, Phillip Brooks, taught in the McKenzie school system, and John Peagler taught in Georgiana. He also contacted a black store owner and operator near Forest Hills who cooperated in giving him the names of black males and females in that community who were considered qualified for jury duty; that he told these three sources that he would like to have people who could read and write but he did not want drunkards. He further said he made a special effort to recruit females of both races and was successful in doing so. He summed up his testimony by saying, "Well, when you go out to get your list, it's a heap easier to add to your number by taking males and females both, rather than just males."
He stated the Jury Commission did not have a legal adviser to explain to the Commission the duties they were to perform under the law but one of the most prominent lawyers in the Circuit would meet with them and give them advice.
A Methodist minister, Zell Gaston Pope, is the Chairman of the Jury Commission of Butler County, and has held that position for three years. He testified the members of the Commission would meet together and divide the areas of the entire county for each commissioner to work in securing the names of qualified persons to perform jury service and they would meet in the Circuit Clerk's office to go over their respective lists and put the names on the official jury roll and in the jury box. Before the Judicial Article became the law of this State, the Circuit Clerk was also the Clerk of the Jury Commission. Reverend Pope stated that, during the three years that he had been on the Jury Commission, he had been out in the county about twenty times seeking the names of qualified persons to serve on the jury. He said the Commission used the voter registration list to aid them in the performance of their duties but he did not use the telephone directory as he knew all the people whose names were in the directory; that he did not check the records in the Tax Assessor's Office or the Tax Collector's Office because he personally knew most of the property owners anyway.
He was asked what standards he used in looking for prospective jurors and he replied, "Well, I try to pick them that I think are honest and would tell the truth, and would be fair." He said he made no greater effort in recruiting females than males, saying, "When I go into a community, I take females and males, all kinds of them," but he did make a special effort to recruit blacks. When asked why, he explained:
"Well, because, for instance, one day I remember going to Chapman, and we have a whole lot of black people down there. So, I went to the store, and there was a colored woman that runs the store, and there was some man in there, and she told me, said, this is old ... I forget what his name was, but the fellow knows everybody in the community. So, I asked him would he give me some of the names of the people that would make good jury men and good women. He said yeah, and he gave me a great, big long list of names."
He also stated that some of the good lawyers had suggested the names of eligible people. He said that when he turned in his list he had made his decision based on the *482 recommendations of the people in the community that they would make good jurymen. He further stated that if any changes were to be made on the jury roll and the jury box these changes would be made in the office of the Circuit Clerk who was also serving as Clerk of the Jury Commission and all the commissioners were present; and that sometimes Judge Gamble was present.
Mr. Bobby Branum, Clerk of the Circuit Court of Butler County, was called as a witness by appellant in support of the motion to quash the jury venire. He testified that prior to a change in the law he served as Clerk of the Jury Commission but no longer serves in that capacity. He was subpoenaed to bring the jury roll of Butler County to this hearing.
From the record:
"Q. Were you subpoenaed in this action, sir, and asked to bring some records with you?
"A. I was, and I have them.
"Q. Alright, let me turn, if I might, to the year 1972, and ask you whether or not you have the jury rolls for that year?
"A. I do.
"BY MR. CHESTNUT: Now, may it please the Court and Mr. Bryan, I understand that these records themselves are the best evidence, but I would like, if the Court would permit and if you don't object, Mr. Bryan, merely to have him read these figures from these records? Read them into the record?
"BY MR. BRYAN: No objection.
"BY THE COURT: Alright.
"BY MR. CHESTNUT:
"Q. Now, looking at the jury roll for the year 1972, in Beat No. 1, Mr. Branum, how many persons served on it? How many persons names are on the jury roll from that Beat?
"A. 131.
"Q. And, that's Beat No. 1?
"A. That's right.
"Q. Of that number, how many are black?
"A. First, let me say that we are reading from a jury roll which is required by Federal Court Order to be kept, in which the jury roll has race indicated on it, the official roll that we have is notdoes not have the race indicated, but, due to the fact that we are under the Federal Court Order, we maintained a jurya copy of the jury roll with the race indicated, and in answer to your question, 17.
"Q. Now, for Beat No. 2, what's the total number of persons from that Beat on the jury roll?
"A. 57.
"Q. And, how many are black?
"A. 8.
"Q. Alright, I'll ask the same question for each Beat, sir, and if you will, just give me first the figure for the total number of persons from that particular Beat, whose names are on the jury roll, then how many of them are black, Beat No. 3?
"A. Total 20, black 20.
"Q. Beat No. 4?
"A. Total 31, black 25.
"Q. Beat No. 5?
"A. Total 40, black 8.
"Q. Beat No. 6?
"A. Total 38, black 9.
"Q. Beat No. 7?
"A. Total 55, black 13.
"Q. No. 8?
"A. Total 71, black 12.
"Q. No. 9?
"A. 37, black 15.
"Q. No. 10?
"A. Total 67, black 49.
"Q. Beat No. 11?
"A. Total 95, black 33.
"Q. No. 12?
"A. Total, 1,028, black, 357.
"Q. Beat No. 13?
"A. Total 77, black 40.
"Q. Beat No. 14?
*483 "A. Total 308, black 100.
"Q. Beat No. 15?
"A. Total 37, black 0.
"Q. Beat No. 16?
"A. Total 84, black 5.
"Q. No. 17?
"A. Total 37, black 12.
"Q. Alright, No. 18?
"A. Total 44, black 4.
"Q. And, beat No. 19?
"A. Total 121, black 19.
"Q. Now, Mr. Branum, if we go to the year 1972I am sorry, 1975, I call the beat number, and if you would, give us the total number of persons from that beat whose names are in the jury box, then the number of blacks.
"Beat No. 1?
"A. Total 57, black 12.
"Q. Beat No. 2?
"A. Total 115, black 14.
"Q. Beat No. 3?
"A. Total 48, black 44.
"Q. Beat No. 4?
"A. Total 23, black 17.
"Q. No. 5?
"A. Total 46, black 7.
"Q. No. 6?
"A. Total 23, black 5.
"Q. No. 7?
"A. Total 28, black 3.
"Q. Beat No. 8?
"A. Total 41, black 16.
"Q. Beat No. 9?
"A. Total 31, black 23.
"Q. No. 10?
"A. Total 53, black 46.
"Q. No. 11?
"A. Total 71, black 40.
"Q. Beat No. 12?
"A. Total 625, black 293.
"Q. No. 13?
"A. Total 65, black 21.
"Q. No. 14?
"A. Total 464, black 107.
"Q. No. 15?
"A. Total 68, black 0.
"Q. No. 16?
"A. Total 132, black 16.
"Q. No. 17?
"A. Total 16, black 7.
"Q. No. 18?
"A. Total 104, black 11.
"Q. No. 19?
"A. Total 100, black 13.
"BY THE COURT: Mr. Branum, for the Court's information, would you give me the total number and total number of blacks?
"BY MR. BRANUM: From 1975 Jury Roll, Your Honor, total number on the roll is 2,110. Total number of blacks, 685.
"BY THE COURT: Thank you.
"BY MR. CHESTNUT: Could we put those same figures in for this year, Your Honor?
"BY THE COURT: You mean for '72?
"BY MR. CHESTNUT: Yes, for 1972, Mr. Branum, would you give me those?
"BY MR. CHESTNUT:
"Q. From the Jury Roll 1972, there is 2,377 on the jury roll, and, of that number 746 are black.
"Q. Now, Mr. Branum, might we go to the year 1976 and again, I shall call out the beat number and ask you to give us the total number of persons in that beat whose names appear in the jury box or on the jury rolls, then give us the number of blacks. After we have completed it, I would appreciate it if you would give us the total numbers and the total number of blacks.
"Beat No. 1?
"A. Total 84, black 12.
"Q. No. 2?
"A. Total 94, black 13.
"Q. No. 3?
"A. Total 29, black 29.

*484 "Q. No. 4?
"A. Total 24, black 13.
"Q. No. 5?
"A. Total 46, black 9.
"Q. No. 6?
"A. Total 35, black 6.
"Q. No. 7?
"A. Total 23, black 6.
"Q. No. 8?
"A. Total 21, black 5.
"Q. Beat No. 9?
"A. Total 41, black 24.
"Q. No. 10?
"A. Total 41, black 27.
"Q. Beat No. 11?
"A. Total 110, black 63.
"Q. No. 12?
"A. Total 1,049, black 385.
"Q. No. 13was that twelve we just finished?
"Beat No. 13?
"A. Yes, total 51, black 29.
"Q. No. 14?
"A. Total 311, black 104.
"Q. Beat No. 15?
"A. Total 41, black 0.
"Q. No. 16?
"A. Total 100, black 22.
"Q. No. 17?
"A. Total 41, black 15.
"Q. No. 18?
"A. Total 119, black 26.
"Q. No. 19?
"A. Total 99, black 23.
"Q. And, the total number of persons in the jury roll?
"A. 2,336, and of those, 808 are black.
"Q. And, that was for the year?
"A. 1976.
"Q. Now, do we have such a compilation for the year 1977?
"A. We do not.
"Q. Alright, what is this large book you have there, sir?
"A. That's the officialwhat I call the official jury roll, and the book that I have been reading the numbers from.
"Q. Are the records kept for the federal court?
"A. That's right.
"Q. Mr. Branum, how long has the federal courts required that this record be kept?
"A. By order of the United States District Court for the Middle District of Alabama, Northern Division, such order dated September 25, 1968.
"Q. Do you mind if I see that, sir?
"A. No, I sure don't.
"BY MR. CHESTNUT: Your Honor, might I have about two minutes?
"BY THE COURT: Yes, sir.
Thereupon, a short recess was taken, and the proceedings were resumed as follows:
"BY MR. CHESTNUT: Alright, Your Honor, I am ready.
"BY THE COURT: Alright.
"BY MR. CHESTNUT:
"Q. Mr. Branum, since 1968, the Federal Court order has required that a breakdown of the jury roll be maintained on the basis of race?
"A. Among other things, yes.
"Q. What are some of the other things they require?
"A. If I may read from a copy of the order, or, maybe a copy of the agreement which the order is based on, that we maintain a jury roll of approximately twenty-one hundred names, of which, thirty percent must be Negro.
"Q. Did it say anything about female?
"A. It did not.
"BY MR. CHESTNUT: I think that's all, Mr. Branum, thank you.
"CROSS EXAMINATION

"BY MR. BRYAN:
*485 "Q. Mr. Branum, have you figured these up, percentage wise, that 1972 is equal to thirty-one percent; 1975 equal to thirty-one percent; and 1976, thirty-five percent?
"A. Mr. Bryan, I have not computed those figures, except to know that they are over the limit set by the Federal Court Order.
"Q. And, the Federal Court Order was thirty percent?
"A. Yes, sir.
"Q. Mr. Branum, you have sat in on those meetings with the other three members of the jury commission when ya'll put the numberthe names and others from the jury rolls, I presume?
"A. Yes, sir.
"Q. Have ya'll ever knowingly, to your knowledge, discriminated against anybody because of race, creed, color, national origin, sex, economic status or age?
"BY MR. CHESTNUT: We object to that question, that's a precise question for which the Court is convened to decide, and he can testify as to what they did or what they did not do, whether or not they discriminated is the question for this Court, not for that witness.
"BY MR. BRYAN: This is cross examination.
"BY MR. BRYAN:
"Q. I'll ask you whether or not, Mr. Branum, you've ever had any conversations to take anybody off of the rolls, to take them off of the rolls because they were black or over 65 or because he was poor?
"A. No, sir.
"Q. Or, female?
"A. No, sir."
At the conclusion of Mr. Branum's testimony appellant's counsel informed the Court that he did not have any more testimony to offer in support of this particular motion.
The State called the Chairman of the Jury Commission and asked him during the three years he had served on the Commission whether or not in going out in the community to select names for jury service he took into consideration any person because of race, creed, color, national origin, sex or economic status, and he replied, "no."
On cross-examination Reverend Pope was asked if he was aware that there was a requirement that the jury roll contain, at all times, at least a minimum of thirty percent black people and he said, "I don't know whether I told everybody we needed thirty percent, we got as many names as we could." He stated the percentage didn't mean anything to him as much as getting the names whether they were white or black. He further said that he was informed that they should get at least twenty percent colored because evidently the jury roll needed that many to get the right average. They were told to get at least twenty percent more to comply with the Federal Court Order and they tried to get more than that percentage.
Appellant's counsel then told the Court he wanted to adopt all the testimony taken on the motion to quash the jury venire in support of the motion to quash the indictment because of discrimination in the jury selection because he didn't have anything in addition to offer. The trial court agreed to this proposal.
Appellant then moved to take up the motion challenging the compilation of the petit jury and in support of this motion he called Mr. Bobby Branum to the witness stand.
Mr. Branum testified that he was Clerk of the Jury Commission at the time women started serving on the jury and later when 19 year old persons were authorized to serve on the jury. He stated that, when the age limit was lowered to 19, the Commission would get all the qualified citizens 19 years and up just as they were formerly getting all qualified citizens 21 years of age and up. He said that when the 19 year old age limit was passed the Jury Commission went into session and purged the jury box and added names, and that this was done every year; that when women were ruled qualified and the age limit was lowered to 19, the jury box was completely emptied *486 and they started over with a new jury roll and refilled the jury box.
On cross-examination he testified that the Jury Commission held yearly sessions and they worked fifty days during the period of August 1st to December 20, as required by the State law. They would purge the jury box and make trips into the various beats in the county to obtain more and new names to go into the jury box.
At the conclusion of this witness's testimony appellant's counsel stated to the Court:
"Well, what we are saying is that all motions that we have which go to either the petit or the grand jury, that we will not offer any additional evidence, but simply adopt the evidence already into the record, and apply to all those motions so far as those motions relating to the juries. We rest on them, and we are going to excuse all the witnesses called in relationship to them, Your Honor."
Appellant then informed the Court that the next motion he wanted to take up was the one to inspect examine and test the physical evidence.
There followed a colloquy between the District Attorney and appellant's counsel with reference to this motion. The District Attorney stated, inter alia, (1) the State did not intend to use as evidence any clothing which might have been taken from the deceased or the defendant; (2) no weapons were taken from defendant's person, home, vehicle, or from the scene of the crime; (3) no fingerprints were taken in the investigation of this case; (4) no blood samples were taken at the scene of the crime or from the defendant's person, home or vehicle; (5) there was nothing in the possession of the District Attorney or the Sheriff's Office or anywhere else even tending to show the innocence of the defendant, and (6) there was no search of the defendant's home, property or car, except there was a police pat down at the time of his arrest.
As to the motions of appellant requiring the State to produce copies of all reports; memoranda; written statements of witnesses; names; addresses; and telephone numbers of witnesses to be called by the State; statements of all persons including memoranda, summaries of recordings of such statements of any person, made to any law enforcement officer or investigative staff of any prosecutor connected with the case; all memoranda, documents and reports to all law enforcement officers connected with the case; names and addresses of all persons having some knowledge or facts concerning the present case; the criminal records and any list or summary reflecting criminal records of all persons whom the State intends to call as witnesses against the defendant; all diagrams, sketches and pictures which have been made by or shown to any witness or prospective witness in this case, and a detailed description of all physical items other than documents and pictures which the prosecutor anticipates using in the trial of the defendant and the exact place where and under whose custody such items are being held, the State objected to the disclosure of these items under authority of Sanders v. State, 278 Ala. 453, 179 So.2d 35; Thigpen v. State, 49 Ala.App. 233, 270 So.2d 666; Johnson v. State, Ala.Cr.App., 335 So.2d 663; Giddens v. State, Ala.Cr.App., 333 So.2d 615.
The trial court denied appellant's motions.
Next appellant took up his motion to quash the indictment on the ground that the statute under which the indictment was returned is unconstitutional. The trial court informed appellant's counsel that this Court had upheld the constitutionality of Alabama's new death penalty law and that he was bound by the decision of this Court, and, thereupon, denied the motion to quash the indictment. To this ruling of the court appellant reserved an exception.
Appellant then moved to his motion which he designated "Motion challenging `death qualifications' voir dire questions." Appellant asserted that the use of death qualifications on voir dire violates the defendant's right to an impartial jury, drawn from a cross section of the community, and *487 asked that the State be instructed not to raise that question. The trial court replied:
"I can tell you now, Mr. Chestnut, if the State doesn't raise that question, the Court is going to raise it. I think the State is entitled to a fair cross section of the community, as well as the defendant, and I think that one of the qualifications for this jury is whether or not they meet what is the Witherspoon versus Illinois qualifications."
Appellant then moved to his motion to sequester the jurors during voir dire. This motion was denied.
Appellant next asked that the District Attorney be required to hand over all written or recorded statements made by the defendant which he had not given defense counsel. The District Attorney made known to the Court that he had given appellant's counsel the statement made by the defendant.
From the record:
"BY MR. CHESTNUT: Have you got anymore?
"BY MR. BRYAN: No.
"BY MR. CHESTNUT: Do you have any statements of any co-defendant?
"BY MR. BRYAN: There are no co-defendants that I am aware of.
"BY MR. CHESTNUT: Do you have any statement of anybody, written?
"BY MR. BRYAN: You mean witnesses?
"BY MR. CHESTNUT: Yes.
"BY MR. BRYAN: Of course.
"BY MR. CHESTNUT: We ask that he be required to hand those over.
"BY THE COURT: That motion is denied.
"BY MR. CHESTNUT: Do you have any statements, Mr. District Attorney, of any persons that would tend to show that the defendant was somewhere else?
"BY MR. BRYAN: No, sir.
"BY MR. CHESTNUT: Have you talked with anybody that gave an alibi for him?
"BY MR. BRYAN: No, sir.
"BY MR. CHESTNUT: Your Honor, we ask that the District Attorney be required to hand over to us the reports ____ the results of any scientific tests that he has, experiments made by the Toxicologist or anybody else, in connection with the defendant, which he intends to use in this trial?
"BY MR. BRYAN: We have the Toxicologist's report which Mr. Chestnut can get for a dollar and a half, under the State law, but I will be happy to give you a copy of it.
"BY MR. CHESTNUT: The defendant is indigent, and we ask that you give us a copy of that.
"BY MR. BRYAN: Here, the post-mortem examination.
"BY MR. CHESTNUT: Do you have any other statements?
"BY MR. BRYAN: No.
"BY MR. CHESTNUT: We would like for the prosecutor to be required to give us, Your Honor, if he has any, any records that he has kept, showing or tending to show how persons named on this venire have voted in past criminal or civil cases?
"BY THE COURT: Your motion is denied."
Finally appellant took up his motion to suppress the defendant's statement made to the investigating officers and testimony was taken on this motion. The first witness was Charlie Pouncey, the Sheriff of Butler County.
The Sheriff testified that he, Deputy Sheriff Danny Joe Duke, and the Chief of Police of the City of Greenville, Alabama, Raymond D. Moody, went to Montgomery, Alabama, where appellant was arrested pursuant to an arrest warrant. Two Montgomery County deputies and two Montgomery City detectives aided in making the arrest. Appellant was in an automobile driven by one Rufus Marsh. At the time of his arrest he was given the Miranda rights and warnings and told the officers that he understood his rights. He was specifically informed of his right to counsel but never told the officers that he wanted a lawyer. He was transported from Montgomery to Greenville in an automobile occupied by the *488 Sheriff, Deputy Sheriff, and the Greenville Chief of Police.
The Sheriff further testified that appellant was not threatened in any manner, nor were any promises made to him, and no inducements of any nature were made to him to get him to make a statement. He said appellant was not under the influence of alcohol or drugs and appeared to be normal in every respect. When they arrived in Greenville, appellant voluntarily showed the officers the route that he took after the robbery and when he was leaving the city. Appellant also pointed out people that he had seen and talked to on his route through the town. After the trip around Greenville, appellant was carried directly to the station house where he was again advised of his constitutional rights by the Chief of Police who then took a written statement from him which he signed in the presence of the Sheriff and the Chief of Police.
Chief of Police, Raymond B. Moody, testified that he took the signed statement from appellant on May 31, 1977 at 2:30 p. m. He stated that en route from Montgomery to Greenville appellant made an oral statement, after being warned of his rights, that he was sorry it all happened and that he felt bad about it. The written statement was not exactly the same as the oral statement because in the oral statement appellant told the officers that someone else was with him when he robbed the store. He later told the police officers he was alone when he committed the robbery.
Danny Joe Duke, Chief Deputy Sheriff of Butler County, testified that he was in the car that transported appellant from Montgomery to Greenville. According to Duke's testimony there was very little conversation on the trip. He remembered appellant making the statement, "that he had done it," and that this statement was made just before they arrived in Greenville. Duke was not present at the time appellant signed the written statement.
Appellant was then called as a witness on this motion to suppress his written and signed statement. In summary, appellant testified that he was 46 years of age and finished the third grade; that he could read and write but that he could not write very well without his glasses. He admitted that the officers warned him of his rights on two occasions and that he was specifically warned that he did not have to make a statement and that he was entitled to counsel. He also admitted that he signed a statement confessing to the crime. He denied that he signed anything waiving his rights but later stated that he was not sure whether he signed such a waiver of right.
At the conclusion of this hearing the trial court denied appellant's motion to suppress his confessory statement.
On the record before us it is manifestly clear that the Jury Commission of Butler County went about the performance of its duties in utmost good faith and exemplified a conscientious devotion to duty in seeing that the jury box was truly representative of the citizens of the county and that all segments of the population were not in disproportion to the whole population. No person was discriminated against because of race, creed, color, national origin, sex, economic status or age.
The testimony of the Clerk of the Jury Commission and the jury commissioners demonstrates not only a lack of intentional or purposeful exclusion of all qualified citizens from jury duty, but, on the contrary, shows a conscious and meritorious effort on their part to put the names of qualified persons on the jury roll and in the jury box, all in keeping with the mandate of the Federal Court Order to keep and maintain at least thirty percent blacks in the jury box.
Fairness in the selection of a jury does not require proportional representation of races. The controlling rule is there must not be a systematic and purposeful exclusion of Negroes from jury duty because of race, and the same rule applies to women and all persons in the age group between nineteen and sixty-five years.
In Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759, the Court said:
*489 "* * * But a defendant in a criminal case is not constitutionally entitled to demand a proportionate number of his race on the jury which tries him nor on the venire or jury roll from which petit jurors are drawn. (citing cases) Neither the jury roll nor the venire need be a perfect mirror of the community or accurately reflect the proportionate strength of every identifiable group. * * *"
In Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469, the Supreme Court ruled that it is the responsibility of that Court, under the Constitution, to redress "jury packing," which is a sinister species of art, but the Court would not condemn good faith efforts to secure competent juries, merely because of varying racial proportions.
The burden of proving racial discrimination in the makeup of a jury by systematic exclusion is on the defendant and purposeful discrimination may not be assumed or merely asserted; it must be proven. Akins v. Texas, 325 U.S. 398, 65 S.Ct. 1276, 89 L.Ed. 1692; Beecher v. State, 56 Ala.App. 212, 320 So.2d 716 (reversed on other grounds); Swain v. Alabama, supra; Butler v. State, 285 Ala. 387, 232 So.2d 631.
We hold that no fraud was practiced by the Jury Commission in filling the jury box and there was no discrimination in compiling the master roll of qualified persons for jury duty in Butler County.
It will be noted that appellant was given a copy of his signed confession and a copy of the postmortem examination during the hearing on the motion to produce. He was entitled to these two documents but he was not entitled to have the State produce all the documents, items and other information catalogued on page 17 of this opinion under authority of the cases there cited. Hurst v. State, 54 Ala.App. 254, 307 So.2d 62, certiorari denied, 293 Ala. 548, 307 So.2d 73. McCants v. State, 282 Ala. 397, 211 So.2d 877.
One other matter came to light during appellant's testimony during the voir dire hearing to determine the voluntary character of his confession. He testified that he was involved in an automobile accident in 1958 in which he sustained head injuries necessitating the placement of a metal plate in his skull. This gave rise to a motion by his counsel for a continuance and to have a medical examination to determine his mental competency. Due to the clarity of appellant's testimony on voir dire the trial judge overruled this motion.
There was no error in overruling appellant's motion for a continuance so that he could have a mental examination. No testimony was introduced tending to show that appellant ever had any previous mental disorders or had been treated for any abnormal behavior. There was nothing before the Court to compel the judge to the conclusion that he should have entertained a "bona fide doubt" or reasonable doubt as to the competency of appellant to stand trial. The cases of Pate v. Robinson, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815, and Pierce v. State, 52 Ala.App. 422, 293 So.2d 483, have no application to the facts in this case.
In Pace v. State, 284 Ala. 585, 226 So.2d 645, the Supreme Court held:
"The legislature has not given a right to a defendant to receive a mental examination whenever he requests one. Absent such a right, machinery for screening requests must exist. The legislature has made the trial court this screening agent. We cannot say under our past cases that the appellant's showing was so compelling that the trial court abused its discretion in denying the petition."
There was no error in denying the motion of appellant's counsel to sequester the prospective jurors during the voir dire examination. This issue was put to rest by the Supreme Court in several cases. In Seals v. State, 282 Ala. 586, 213 So.2d 645, the Court said:
"The Court did not err in overruling a motion of an attorney for the defendant below that he be permitted `to examine each prospective juror outside the presence of the other jurors.' Jurors may be qualified on voir dire in groups at the discretion of the trial court."
*490 To the same effect are the holdings in Beecher v. State, 288 Ala. 1, 256 So.2d 154, and Johnson v. State, Ala.Cr.App., 335 So.2d 663.
We turn now to a consideration of the trial in chief. Prior to qualifying the jury appellant's counsel renewed his motion to have the Court appoint three reputable specialist practitioners in mental and nervous diseases to examine and determine the mental condition of the defendant and the existence of any mental disease or defect which would affect his present criminal responsibility or his criminal responsibility at the time of the commission of the crime. Counsel cited Sections 15-16-20, 21 and 22. He offered no testimony tending to show that appellant had suffered any mental disorders in his past life. He simply based his motion on appellant's testimony during the voir dire hearing concerning his confessory statement that he had brain surgery in 1958 following an automobile accident.
The Court replied:
"Alright, let the record show that the defendant testified in his own behalf on the preliminary motions filed by him in this Court, along with other witnesses, that none of the other witnesses testified as to any unusual mental condition of the defendant. That the defendant himself testified, ... that the defendant, before he testified, asked the advice of his counsel before testifying, that the defendant testified in a clear and lucid manner, and the Court finds no reason from the record, to inquire further into his sanity, and your motion is denied."
Counsel for the defendant then stated, "Well, that concludes any preliminary matters that we have, Your Honor."
Thereupon the Court proceeded to qualify the jury. Several jurors stated they were personally acquainted with the deceased and several more stated they had heard the victim was robbed and injured during the course of the robbery; that he was later carried to a hospital in Montgomery where he died. Appellant challenged these jurors on the ground they could not view and consider the evidence objectively.
The Court asked each of the jurors who answered he knew the deceased, Mr. Zeigler, would the fact he personally knew the deceased in any way influence his verdict, and the jurors answered, "No, sir."
"BY THE COURT:
"Can you put aside the fact that you knew Mr. Zeigler, can you put aside the things you have heard, if you are selected as jurors to try this case, and try this case solely on the evidence as it comes to you from the witness stand?"
All such jurors answered, "Yes, sir."
"BY THE COURT:
"Can you give this defendant a fair and impartial trial with the knowledge you have of the facts, and the fact that you knew Mr. Zeigler?"
All such jurors answered, "Yes, sir."
The Court denied appellant's challenge as to all the jurors challenged in the light of their statements, under oath, that they could give the defendant a fair and impartial trial.
The jury panel examination continued and one juror, Mr. Jackson, stated that he was already 65 years of age and was retired. The State challenged this juror and the challenge was sustained.
Counsel for appellant asked Mr. Jackson to give his birth date and he said, "I don't know exactly." He was asked how he knew he was over 65 and he replied that his sister told him.
From the record:
"BY MR. CHESTNUT: Your Honor, I object to excusing Mr. Jackson, we don't know that he is over 65, he doesn't know how old he is.
"BY THE COURT: I believe the law says that the jury will be qualified on the oath of the jurors."
The Court overruled the objection and told Mr. Jackson to step aside.
The Court continued to qualify the jury and the following occurred:
"BY THE COURT: Are any of you related by blood or marriage to the alleged victim, Floyd M. Zeigler? *491 "BY A JUROR: Yes, I am.
"BY THE COURT: What is your relationship?
"BY A JUROR: Cousin.
"BY THE COURT: What cousin is that?
"BY A JUROR: Distant cousins.
"BY THE COURT: Can't you give me any degree, or any better idea what the relationship was?
"BY A JUROR: Well, I don't know which cousin, I was a Harrison, and his mother was a Harrison.
"BY MR. CHESTNUT: We challenge her, Your Honor.
"BY THE COURT: Alright, you may step aside.
"BY MR. BRYAN: Your Honor, same argument that Mr. Chestnut gave, it hasn't been shown whether she is in the fifth degree of affinity, or in the ninth degree of consanguinity.
"BY THE COURT: You don't know what the relationship is?
"BY A JUROR: No, just distant cousins.
"BY THE COURT: Alright, your challenge is denied, Mr. Chestnut."
Under the provisions of Section 12-16-150, Code 1975, it is a good ground for challenge of a juror by either party:
"(4) That he is connected by consanguinity within the ninth degree, or by affinity within the fifth degree, computed according to the rules of the civil law, either with the defendant or with the prosecutor or the person alleged to be injured."
It is also good ground for challenge,
"(8) That he is under 19, or over 65 years of age."
We find no error in the action of the Court in excusing juror Jackson. Under oath he stated that he was already over 65 and had retired.
It is the policy of the law not to have persons over or under age on the jury. Such fact is a proper cause for excusing the juror. Letson v. State, 215 Ala. 229, 110 So. 21; Slay v. State, Ala.Cr.App., 338 So.2d 3.
As to the juror who stated she was a distant cousin to the deceased without more does not tell this Court anything. Consanguinity, like affinity, must be determined according to the rules of civil law. Relationship within certain degrees, whether of consanguinity or affinity, is an absolute disqualification. Brazleton v. State, 66 Ala. 96; Little v. State, Ala.Cr.App., 339 So.2d 1071.
It, therefore, becomes the duty of the trial judge to determine the precise degree of relationship of a juror to an injured party, whether by blood or marriage, when that issue is raised. See "The Nolan Chart of Relationship and Degrees of Kindred According to the Civil Law" on page 355 of 255 Ala., on page 542 of 51 So.2d of the case of Owen v. State, 255 Ala. 354, 51 So.2d 541.
There was no error in sustaining the State's challenge to juror Jesse Godwin.
From the record:
"BY THE COURT: Alright, do any of you have a fixed opinion as to the imposition of the death penalty? If you do, raise your hands?
"BY A JUROR: Judge, my name is Jesse Godwin. I wouldn't vote the death penalty.
"BY THE COURT: Mr. Godwin, can you conceive of any circumstances or any sets of facts under which you would vote the death penalty?
"BY MR. GODWIN: Judge, I don't think so.
"BY THE COURT: Are you telling this Court that you are, irrevocably committed, before the trial of this case, to vote against it?
"BY MR. GODWIN: For conscience sake, yes.
"BY THE COURT: Regardless of what the facts are?
"BY MR. GODWIN: For conscience sake, yes.
"BY THE COURT: In other words, you would automatically vote against the imposition of the capital punishment, without regard for any evidence that might be developed in this case?
"BY MR. GODWIN: Yes, sir.

*492 "BY THE COURT: If you were sitting as a Juror on the trial of this case, and you were convinced beyond a reasonable doubt and to a moral certainty that the individual was guilty, and that the supreme penalty, the death penalty should be enacted as punishment, and that the death penalty would be the proper punishment, do you have a fixed opinion against imposing the death penalty?
"BY MR. GODWIN: I don't believe that's within my jurisdiction to vote that.
"BY THE COURT: To answer my question, you say that you would not?
"BY MR. GODWIN: No, sir, I would not.
"BY MR. BRYAN: Your Honor, State of Alabama challenges for cause.
"BY THE COURT: Alright, you may step aside."
We conclude that the trial court was correct in sustaining the State's challenge to juror Godwin. Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776; Seibold v. State, 287 Ala. 549, 253 So.2d 302; Hubbard v. State, 285 Ala. 212, 231 So.2d 86.
Around noon on April 28, 1977, Raymond B. Moody, Chief of Police of the City of Greenville, received a call to go to Zeigler's Hardware Store in that city. He found Mr. Zeigler on the floor close to the cash register in a semi-conscious condition. He was bleeding profusely from the head and mouth. The Rescue Squad arrived and carried Mr. Zeigler to a local hospital where he was given emergency treatment. He was transferred to a Montgomery hospital where he subsequently died.
Chief Moody further testified that a gun cabinet in the store had been broken into and there were some vacant spaces on the shelves where the victim kept his gun inventory. Photographs of the pistol cabinet were introduced into evidence and they clearly showed that the hasp had been broken or knocked off and several weapons were apparently missing. The pistols remaining in the cabinet were in a state of disarray.
An intensive investigation was immediately conducted in an effort to find the person or persons responsible for the robbery, the gun theft, and the murder of Mr. Zeigler. The investigation finally focused on appellant and he was arrested in Montgomery on May 31, 1977.
An autopsy was performed on the body of the victim by State Toxicologist G. R. McCahan, Jr. He gave a detailed summary of his education, experience and qualifications in the field of toxicology and in conducting post-mortem examinations to determine the cause of death. His qualifications were not questioned by defense counsel.
The post-mortem examination was made by Dr. McCahan on April 29, 1977, at the Dunklin Funeral Home in Greenville. He stated that he found eleven external wounds to the head of the deceased and these injuries were recent. There were numerous lacerations of varying lengths over most of the entire head, face, nose and neck.
In describing the internal injuries and the cause of death, he testified as follows:
"A. The first thing I did was make an incision from behind the ear to the other side of the ear, and reflect the scalp. That was, of course, after I had removed the sutures so that I could investigate the character of the wounds themselves.
"Q. Would you please describe to me what the word reflect means?
"A. It means I pulled it frontwards and backwards so I could see the skull itself, the bony part of it. Alright, underneath the scalp and associated with these lacerations in the area that I had pulled the scalp back from itself, were areas of hemorrhage or bleeding and bruising. In other words, I found a large number of massive areas of hemorrhage, large areas of bleeding into the tissue right there (indicating), and a pooling of blood. In other words, it had collected in some of these areas throughout the scalp.
"The area then was looked at again, and in the right front of the skull itself, of the bony portion, there was a one and one-quarter inch in diameter, penetrating *493 wound. In other words, it went through, into the brain proper. It's just a little bit right of the anterior midline, just a little bit right of it. And, there was some small fragments of bone still adhered to the edge of the hole itself, and they were semi-lunar in shape, or like a new moon, crescent in shape, and still partially attached. I noticed that there were fracture lines running both to the left and to the right of the hole that I have just described, with the majority of them taking in the area over the left eye. The bone by the area right here was broken (indicating).
"Then, looking further back on the scalp, underneath the scalp on the skull itself, the entire left side, and by that, I mean exactly that, the entire left side of it was just broken into numerous, fairly small pieces, anywhere from an inch on each edge, downwards. These were pieces of bone, and some of these pieces of bone had been driven into the brain on the left side, and some had been driven into the brain tissue underlying this on the right side. I removed the brain itself, and looked at the floor of the cranial vault, or, brain cavity, and in that area, I found that if you were to look down on it, straight back through the bottom was effectively split apart, and across to here (indicating) was also another line on the bottom of the floor where the brain lies, there was a fracture line there too. So, there were two fracture lines in the bottom of the cranial vault. In that area itself, as I noted, there were pieces of bone driven into the brain tissue. Also, there was a large amount of bleeding, which we call hemorrhage, and it had filled up any of the spaces that were in there. I also checked the brain for any abnormal tissue of any different type, and found none. So, except for trauma involved in that area, I could find nothing that was grossly abnormal about the brain itself.
"Q. Alright. Doctor have you reached a conclusion, based on all of your autopsies and all of your research and all of your studies, have you reached a conclusion as to the cause of death in this case?
"A. Yes, I did.
"Q. Would you please tell the jury what that is?
"A. In my opinion, cause of death in this case was the result of multiple blows to the head, by a blunt instrument or blunt instruments of some sort."
Mr. Adolph Williams testified that he was employed by Mr. Zeigler to help in the store when he was needed. He stated a Mr. Tollie Shanks was also employed by Mr. Zeigler but in April of 1977 Mr. Shanks was ill and in the hospital and had been there for quite awhile. He further testified that on Wednesday, April 27, 1977, Mr. Zeigler went fishing and that he, Williams, opened the store that morning about 7:30 a. m. He stated that the stores in Greenville usually closed on Wednesdays at 12 o'clock and that he closed and locked the store on that date about 12 o'clock. He said there were two sets of keys to the store and he had one set and Mr. Zeigler had the other set. He stated that when he closed the store on April 27, 1977, there was between $150.00 and $200.00 in the cash register and he sold around $31.00 worth of merchandise that Wednesday morning.
Mr. Williams was shown State's Exhibit 18, marked for identification, and was asked if he recognized that exhibit. This exhibit was a ledger and Mr. Williams identified it as "a record of his guns that he sold." He further stated that this ledger was kept by Mr. Zeigler in the regular course of his business and that he had seen this same book numerous times during the time he worked in the store. This witness said the gun case or cabinet was full of pistols on the Wednesday that he closed the store and the cabinet doors were locked. He stated that about four feet from the gun cabinet was a display area for wrenches, pliers and other hardware tools. The wrenches would weigh a pound or two. He further stated that he went by the store the next day about 8:30 a. m. for a few minutes and asked Mr. Zeigler about his fishing trip and then went on.
*494 The State offered into evidence State's Exhibit No. 18, the leger of the gun invoices that was kept in the regular course of business. Defense counsel objected on the ground the proper predicate had not been laid to introduce this book, saying, "Maybe I ought to ask him a few questions about it." He was allowed to do so.
In response to questions propounded by defense counsel Mr. Williams testified that the entries in the book were not in his handwriting but the handwriting was Mr. Zeigler's and that he imagined Mr. Shanks might have written in the book. He stated that he never sold a gun; that the book was a record that the federal law requires to be kept. When the book was not being used it stayed locked up in a safe in the store. The safe was open during business hours but was locked at night; that when a gun was sold the person selling the gun would go to the safe, get the book, write up the sale and return the book to the vault. At the conclusion of this testimony defense counsel stated, "Well, I don't have any objections to it going into evidence, Judge." The Court replied, "Alright, it will be received, and you may be excused."
The record reflects that, "the article hereinabove marked for identification as State's Exhibit 18 was received in evidence."
Linda Gail Lewis testified that on the day the victim was robbed she was sitting in a chair in her yard on Oglesby Street in Greenville and appellant came up to her with a sack in his hand. She said he removed a radio from the sack and gave it to her, saying, "We are cousins," and he told her that he had a gun in the sack. She stated that she gave the radio back to appellant because he had gotten them into trouble before. She further testified that she had known appellant for about two years and they were not cousins; that on the date he tried to give her the radio appellant was dressed in a white coverall suit.
On cross-examination this witness testified that it was on September 3, 1977, that appellant tried to give her the radio and that the time was about 12 o'clock. On redirect examination she said it was on the day that the robbery occurred.
Voncile Taylor testified that she lived on South Park in Greenville and that on the day that Mr. Zeigler was robbed she saw appellant walking down World Street; that he was dressed in white coveralls; that she was walking about twenty feet behind him and the time was after lunch. She said that appellant had a brown paper bag in his hand and he dropped some guns on the street. She saw him stop and begin to pick up the guns and walk away but he left one gun where he dropped the bag. She picked up the gun and carried it to her home. She also picked up a firing pin at the same time she picked up the gun. She was shown State's Exhibit 19 and stated that it looked like the gun she picked up; that her "old man", Charles Cook, got the gun after she carried it to her home.
On cross-examination this witness testified that she knew appellant and her "old man" knew him. She stated she found the gun which was lying on the street; that appellant just left the gun and walked slowly away. She said she did not tell her "old man" that she saw appellant drop the guns when she gave him the one she picked up, but that she did tell him later. She testified that her "old man" sold the pistol to Benny Betton but he did not tell her how much he got for the gun. She further stated that Sheriff Pouncey came to her later and got the firing pin; that she and her "old man" heard what happened to Mr. Zeigler but not before the gun was sold to Benny Betton. When she heard about Mr. Zeigler she became apprehensive because she did not know where the gun appellant dropped came from. She told the Sheriff that appellant was the person who dropped the gun that she picked up.
Charles Edward Cook testified for the State. According to his testimony, he was living with Voncile Taylor in April of 1977 when Mr. Zeigler was robbed. He was shown State's Exhibit 19 and identified it as a .38 caliber pistol; that he first saw the pistol at his house the night of the same day that Mr. Zeigler was robbed. He said he *495 knew appellant and identified him in Court. He stated that he sold the pistol to Benny Betton for sixty dollars and a .32 caliber pistol.
On cross-examination Cook testified that he really did not personally know appellant but knew of him. He said that Voncile Taylor told him that appellant was coming down the street and dropped the gun and she picked it up. He stated that he didn't know anything to do with the gun but sell it. He said it was a day or two after he sold the gun that he heard about the robbery, and Benny Betton came and talked to him about the gun but did not offer the gun back to him. He was asked if he knew what happened to the gun and he pointed to it in court and said, "There it is."
Benny Betton testified that he remembered when it was said that Mr. Zeigler was robbed and killed. He admitted buying a gun from Charles Cook and that it was a .38 Smith & Wesson. He was shown State's Exhibit 19 and said that was the gun he bought from Charles Cook and he bought the gun on the Saturday after the robbery. He stated that he traded the gun to Jeff Teitloff in Troy, Alabama.
Jeff Teitloff testified that he lived in Troy, Alabama, and owned Troy Paint and Body Shop. He said he remembered Benny Betton from a business deal he had with him the first part of the summer of 1977. He stated Betton came to his place and was interested in a Camaro car body and he had wanted to do some trading; that Betton came back three weeks later and they worked up a trade on a .38 Smith & Wesson pistol for the Camaro car body. He said he kept the gun around the shop as he sometimes worked late at night. One night two police officers came to his shop to see about him and they got to talking about guns. He knew one of the officers and offered to sell him the gun. The officer said he would mention it around the Police Department and around 2:30 the next morning the officers came to his house and told him the gun had been stolen in a murder-robbery in Greenville, Alabama. He gave the weapon to Detective McLendon of the Troy Police Department and also gave him a statement about his connection with the pistol. He identified the weapon as the same one that he traded to Betton and the same one he gave to Detective McLendon.
Detective James McLendon was called as a witness for the State. He testified that he knew Jeff Teitloff and first met him in May of 1977 when he gave him a revolver. He identified State's Exhibit 19 as the weapon he received from Teitloff and he gave the serial number on the gun 2D20651. He stated that he turned the weapon over to Lieutenant W. C. Berry of the Greenville Police Department. He said he received the weapon from Jeff Teitloff on the 27th day of May, 1977.
This same weapon was traced from Lieutenant Berry to Chief Raymond B. Moody and from Chief Moody to Sheriff Charlie Pouncey of Butler County. There was no unbroken link in the chain of possession of this weapon.
Ms. Brenda Franklin testified that she was employed by Hicks, Incorporated and had been so employed for fifteen years. Hicks was a wholesale sporting goods store. She said she was the Secretary and responsible for incoming and outgoing firearms and small arms ammo. She stated that Zeigler Hardware of Greenville, Alabama, was one of their accounts. She was shown State's Exhibit No. 20, marked for identification, and was asked if she could identify it. She said it was an invoice from Hicks, Incorporated, and bore her initials. She explained that her initials meant that this gun was recorded in the Company's records, and was okayed by her to be shipped out. She stated that this invoice was kept in the regular course of business of Hicks, Incorporated, in Luverne, Alabama. She further testified that the invoice showed that Hicks, Incorporated, sold a Smith & Wesson pistol, number 20, two inch round, blue, serial number 2D20651, to Zeigler Hardware, Greenville, Alabama. The date of the sale was April 13, 1977.
Mr. Glenn B. Kibbler, a special agent with the Bureau of Alcohol, Tobacco and Firearms, a division of the United States *496 Treasury Department, was called as a witness for the State. He testified that he knew Mr. Zeigler in his lifetime and that pursuant to his duties he had inspected the books and record of Zeigler Hardware Company over a period of years. He stated that in accordance with the Gun Control Act of 1968 Mr. Zeigler was required to keep a bound volume showing the acquisition and disposition of all firearms purchased and sold through his place of business. He was shown State's Exhibit 18, the ledger or book that Mr. Williams testified was kept by Mr. Zeigler in the usual course of his business, and stated that he was familiar with this book and the manner in which Mr. Zeigler kept his gun records as required by federal law. He had examined this book since 1968 when the law came into effect. He was asked to examine the book to see if there was an entry for a pistol with the serial number 2D20651 (State's Exhibit 19, which was the pistol that Voncile Taylor saw appellant drop on the street and she picked up) and Mr. Kibbler replied, "Yes, I find that weapon here." He further testified that this particular weapon was purchased from Hicks, Incorporated, Luverne, Alabama, a holder of a federal firearms license. He stated the acquisition portion of the book was filled in for this weapon but the disposition part of the book was left blank, indicating this weapon was not sold. He further said that the book dating back from 1968 contained disposition entries on the firearms which he sold, and that he had never found any discrepancies in Mr. Zeigler's book.
Mr. Kibbler was asked to explain the different columns in State's Exhibit 18 and he stated the first column shows the name of the manufacturer of the firearms. He said one side of the book is the acquisition portion of the record, "as the gun is acquired by the federal licensed dealer, he is required by law to enter that gun into his bound book the day it comes into his shop. Then, he would fill out the other side of the page, which is the disposition portion of the book, on the day that the firearm leaves his shop."
This witness was asked to examine the book to see if there was an entry for the following firearms: 357 Highway Patrol model, serial number N-269890; .32 caliber weapon, serial number 897197; .22 caliber weapon, serial number T-500687; a GT .380 caliber, serial number 04468; and a pistol with serial number 2D20651. Mr. Kibbler replied that all of these weapons were listed in the book but they were not listed in the disposition part of the book which indicated they had not been sold. This testimony was admitted into evidence over the objections of appellant.
At the conclusion of this witness's testimony, appellant's counsel made the following motion:
"Your Honor, we move to strike this witness's testimony and we also move for a mistrial on the grounds that the witness has been brought in as an expert of sorts from the federal government, and instead of testifying from a document, saying that the document indicated, that no disposition was made on some particular weapon, the witness has gone forward to state his conclusion that such and such a weapon was not in fact sold, and that is beyond the purview of this witness, and it's critical in this case. We cannot recover from it, and we move for a mistrial."
The motion was denied, and we think rightly so. We have examined Exhibit 18 and find that it consisted of thirty-four double page sheets with ten column headings reflecting the names of the gun manufacturers; make or model, the serial numbers of each weapon; the type of action of each gun; the caliber or gauge; the purchase date; the names of the vendors; the names and addresses of the persons to whom the weapons were sold; and the dates they were sold. These entries were recorded over a ten or eleven year period and reflect an inventory of approximately twelve hundred firearms. In addition the book shows that approximately one hundred and fifty guns were not listed in the disposition column.
State's Exhibit 18 was properly admitted into evidence as a record made in *497 the regular course of business pursuant to the provisions of Section 12-21-43, Code of 1975.
There was no error in permitting witness Kibbler, who was thoroughly familiar with the book in which the deceased recorded his gun transactions, to give a shorthand rendition of the facts relating to the contents of State's Exhibit 18 and the missing guns.
In this State the rule is stated to be: "In the cases where it is impracticable or impossible for the Court [jury] to make an examination of a large number of instruments, entries, or records, a competent witness may make such examination and present his conclusions thereon to the Court [jury]." Sov. Camp, W.O.W. v. Hoomes, 219 Ala. 560, 122 So. 686, 692; Kersh v. State, 26 Ala.App. 15, 153 So. 284. See Gamble, McElroy's Alabama Evidence, Third Edition, Sections 220.01, 220.02.
The reason for the rule is that any other course would cause great loss of time and tend to confuse the jury. To have refused the testimony of Kibbler would have thrust upon the jury an unduly arduous and time-consuming task. It is very doubtful that the jury could have examined the gun book and found the missing weapons as testified by Kibbler.
Katy Harris Chambers testified for the State. According to her testimony appellant, on the day of the robbery, came to her mother's home in Honoraville, Crenshaw County, and asked her to drive him to the home of one Rufus Marsh. She told him she didn't have a car and he would have to ask her mother. The mother agreed to carry him to Marsh's house and appellant gave Chambers two weapons as compensation for the trip. One was a .32 caliber pistol and the other was a .22 caliber pistol. She gave her mother the .22 caliber weapon and kept the .32. Subsequently, these two guns were given to the Sheriff of Butler County. During the trial this witness was shown the two guns and stated they looked like the guns that appellant gave her on the day that Mr. Zeigler was robbed. She further stated that at the time appellant gave her the guns she had not heard about the robbery.
Sheriff Charlie Pouncey was recalled as a witness and verified that the two pistols, Exhibits 21 and 22, were turned over to him by Callie Mack, the mother of Katy Harris Chambers. He testified these two weapons had been in his exclusive possession since he received them from Callie Mack.
Rufus Marsh testified that he lived at Honoraville, Crenshaw County, and had known appellant for thirty years and pointed to him in the courtroom. He said he recalled the occasion in April, 1977, when Mr. Zeigler was alleged to have been robbed and killed and that on the afternoon of that date appellant came to his home and asked him to take him to Montgomery; that when appellant arrived he was wearing white coveralls and was carrying a brown paper bag. He further stated that appellant gave him four dollars and a pistol to take him to Montgomery. He was shown State's Exhibit No. 23 and identified it as the pistol appellant gave him. He said about a month later he gave the gun to Sheriff Pouncey and this was verified by the Sheriff on recall as a State witness. State's Exhibit 23 was offered and received in evidence without objection.
The State presented several other witnesses who testified seeing appellant on the streets of Greenville the day Mr. Zeigler was robbed.
Mr. Jim Denson testified that he was employed by Teague Hardware Company in Montgomery, Alabama, as a purchasing agent, and he was responsible for logging into the records of the company all the pistols which the Company bought and sold. He identified State's Exhibit No. 25 as a bill of sale made to Zeigler Hardware Company in Greenville. This document showed that Teague Hardware sold a model 28 pistol to Zeigler Hardware Company and the serial number was N-269890. This pistol was listed in Mr. Zeigler's gun book as having been received but it did not appear in the disposition column as having been sold according to the testimony of Mr. Kibbler. The bill of *498 sale was introduced into evidence without objection.
Chief of Police Raymond Moody was recalled as a witness for the State and testified that on April 28, 1977, he went to Zeigler's Hardware Store in Greenville. He inspected the cash register and found approximately seventeen dollars in change, but no currency.
He further testified that he and several other officers arrested appellant in Montgomery on May 31, 1977, pursuant to an arrest warrant, and he advised him of the Miranda rights and warnings at the time he was arrested. At this point a hearing was held outside the presence and hearing of the jury.
At the hearing Chief Moody stated that he, and no one in his presence, applied any violence to the defendant; that no promises or threats were made to him; that no inducements of any kind were made to him to get him to make a statement; that he was not promised any immunity. He was asked what he advised the defendant and he replied:
"That he may remain silent, and does not have to make any statement at all. That any statement that he might make may be used against him in Court, and that he had the right to consult with an attorney before making a statement, and to have such attorney present while making a statement. And if he did not have enough money to employ such attorney, that he would have the right to have one appointed and to consult with the attorney and to have him present while making a statement and if he did make a statement, that no questions would be asked of him until the attorney was present with him to represent him."
Chief Moody further stated that the defendant said he understood his rights and voluntarily signed a waiver of rights form by making a mark (x) thereon in his presence and in the presence of the Sheriff of Butler County, both of whom signed as witnesses. After signing the waiver of rights form, appellant made a statement which was written by Chief Moody. After the written statement was taken it was read to appellant and he put his mark (x) on each page of the four-page statement.
On cross-examination Chief Moody was asked, "What specifically did the defendant say to indicate to you that he understood the statement that he signed?" The Chief replied, "He said he just felt bad about the whole thing, and he would like to talk about it."
At the conclusion of Chief Moody's testimony the trial court ruled that appellant's confession was knowingly, understandingly, and voluntarily made. The State laid the proper predicate for admission of appellant's confessory statement. The statement is as follows:
"On Thursday morning, April 28, 1977, at approximately 11:30 A.M., I was wearing a pair of white prison clothes and went into Zeigler Hardware Store on Commerce Street.
"I was over behind the counter trying to steal a knife, another guy was with me talking to the man.
"After the man caught me, he grabbed me and hit me and I grabbed a piece of iron, like a tire tool, and hit him with it twice. I was trying to get loose from him and the other guy pushed him.
"The other guy opened the gun case and we got two paper bags and got some guns. Six or seven pistols. The other guy got some in a sack.
"Mr. Zeigler was lying in the floor telling us to get out.
"I left, but the other guy stayed. I left and went toward the Courthouse on Commerce and stopped at the 76 Station across from City Hall. I went to the mens restroom and took the money out of the billfold, thirty-six dollars, and put it in the trashcan in the restroom.
"I left the 76 and walked to Grayson's Store at Court Square. I went south on Conecuh Street to Parmer Street, turned right and walked west to Oglesby Street. Turned north on Oglesby Street and walked to a yard by Max's Sandwich Shop. I talked to a lady and a girl. I *499 still had my sack of six or seven pistols with me. I left there south on Oglesby and had a drink with a man on his porch in front of Lee Albert Crittenden's Barber Shop.
"I then continued south on Oglesby Street and took a left on World Street. Walked on World Street east to South Park Street and dropped a pistol and picked it up and put it back in my sack. I then kept going east to Dollar Bill's house. I set the sack on the porch and talked to Will Murphy (Dollar Bill) and asked about my uncle Lewis Hawkins. Dollar Bill told me where he lived and I walked through a path to my uncles and he wasn't home. I walked east on Perdue to Mr. Allen's house and he carried me out to the country. We stopped by Robert Mack's house. He wasn't at home. I then went to Joe and Callie Mack's house in Honoraville, Alabama. I left two pistols with them and stayed around until late that afternoon.
"We drank some whiskey and he carried me to Rufus Marsh's house and he carried me to Montgomery. I gave him one pistol for carrying me to Montgomery. He carried me to South Holt Street, John T. Montgomery and Ned Reese were with him. I walked to my house 355 Wayne Street. I had sold or gave away all the guns.
"This is a true statement to the best of my knowledge and consists of four pages.
"I have not been promised a reward or hope of reward.
"I make this statement because I am sorry about killing the man and want to tell the truth.
"This statement can be used in Court.
"Statement made in the presence of Sheriff Pouncey, John Andrews, Danny Duke and R. D. Moody and his mark.
"Q. What time was this taken, please?
"A. 2:30 P.M. on May 31st."
During this same interrogation, and after appellant was again advised of his constitutional rights, he made and signed two other statements in connection with the robbery of Mr. Zeigler. These statements are as follows:
"2:25 P.M. May 31st, 1977.
"Question, did you hit Mr. Zeigler with a piece of iron in the head several times when you were in his hardware store two days after you got out of the county jail?
"Answer, yes, that's right.
"Question, how did you get the billfold?
"Answer, after I knocked him down, I reached in his pocket and got it.
"Question, tell me about each gun?
"Answer, number one, first two Callie Mack got.
"Number two, Rufus Marsh got one for carrying me to Montgomery.
"Number three, John T. Montgomery sold three of them out of the bag while we were in the car.
"Number four, I sold one in Montgomery for ten dollars to a black dude. This was down below my house on Wayne Street about three weeks ago.
"Question, were you alone when you went into the hardware store?
"Answer, no, sir, there was a black male with me. Taller than I am, had a beard. Real black, from Fort Deposit.
"Question, whose idea was it to go in the hardware store?
"Answer, he told me (the black man) that we should go in and steal a gun to get some money.
"This statement consists of two pages.
"This is a true statement to the best of my knowledge.
"I have not been promised a reward or hope of reward to make this statement.
"This statement can be used in a Court of law.
"Made in the presence of Sheriff Pouncey, Danny Duke, John Andrews, R. D. Moody, his mark was put at the bottom of the page and on the first page also."
"Willie Lewis Mack, May 31st, 1977 at 3:10 P.M.
"Question, did you just make up the story about the other man and you did it alone?
"Answer, yes, sir. I just made him up. He was not with me. I was alone.

*500 "This is a true statement and I made it of my own free will. No reward or promise of reward was made for me to change it.
"I now have told the truth.
"One page statement made in the presence of Sheriff Pouncey, John Andrews, Danny Duke, R. D. Moody and Willie L. Mack put his mark on it."
Before these statements were actually read to the jury appellant's counsel made a motion to permit the defendant to take the witness stand for the limited purpose of testifying concerning the voluntariness of his confession. The trial court denied this motion and held that once a defendant waives his right to remain silent he waives it for all purposes, "on any and all matters concerning the case." Appellant then declined to take the witness stand and subject himself to cross-examination on any question material to his guilt or innocence.
At the suppression hearing the defendant testified to the circumstances surrounding the giving of the confessory statements. Cross-examination was limited to the issue of voluntariness alone.
It is settled law in this State that an accused who elects to testify in his own behalf waives his right not to be compelled to give incriminating testimony and may be cross-examined to that end. Smith v. State, 247 Ala. 354, 24 So.2d 546; Coats v. State, 253 Ala. 290, 45 So.2d 35; Pruitt v. State, 232 Ala. 421, 168 So. 149; Gast v. State, 232 Ala. 307, 167 So. 554; Boulden v. State, 278 Ala. 437, 179 So.2d 20.
Finally appellant contends that Act 213, 1975 Ala.Acts, page 701 et seq., now Sections 13-11-2, et seq., Ala.Code 1975, is unconstitutional. The constitutionality of this law is no longer an open question in this State. On May 19, 1978, the Supreme Court of Alabama, in Ex parte: Jacobs (In re: Jacobs v. State of Alabama), 361 So.2d 640, affirmed this Court's opinion in upholding the conviction of murder in the first degree, including the sentence of death, and holding the Act constitutional.
Section 13-11-4, Ala.Code 1975 provides, in pertinent part, as follows:
"If the Court imposes a sentence of death, it shall set forth in writing, as the basis for the sentence of death, findings of fact from the trial and the sentence hearing, which shall at least include the following:
"(1) One or more of the aggravating circumstances enumerated in section 13-11-6, which it finds exists in the case and which it finds sufficient to support the sentence of death; and
"(2) Any of the mitigating circumstances enumerated in section 13-11-7 which it finds insufficient to outweigh the aggravating circumstances."
Chief Justice Torbert in his concurring opinion in the Jacobs case, supra, said:
"The Court of Criminal Appeals and this Court, by statute (Section 12-22-150, Code of Alabama 1975) and by Court rule (amended Rule 39(c), Ala.R.App.P.) respectively, must review the decision of the trial court where the death penalty is imposed. This mandatory review guarantees that, before a defendant can be executed in Alabama, the sentence of death must be found appropriate by both the Court of Criminal Appeals and this Court after a review of the aggravating and mitigating circumstances found in the case by the trial judge.
"However, this appellate review safeguard a substantial protection for the defendant in Alabamais nonexistent unless the trial judge conducts a full and fair sentencing hearing and enters complete written findings as to aggravating and mitigating circumstances. * * * " Emphasis supplied)
The trial court set a sentencing hearing but he did not enter "complete written findings as to aggravating and mitigating circumstances."
The sentencing hearing is one of the most important and critical stages under Alabama's death penalty law. The guilt stage has passed. Now an experienced trial judge must consider the particularized circumstances surrounding the offense and the offender and determine if the accused is to *501 die or be sentenced to life imprisonment without parole. It is a due process hearing of the highest magnitude and the exclusionary rules of evidence play no part. The trial evidence must be reviewed to determine all of the aggravating circumstances leading up to and culminating in the death of the victim and then all the mitigating circumstances must be considered in determining if any outweigh the aggravating circumstances so found in the trial court's findings of fact. Unless and until this is done "the trial judge cannot fairly weigh the aggravating and mitigating circumstances, and the appellate court cannot adequately review his sentencing decision."
Prior to the date set for the hearing the trial court shall order a pre-sentence report and furnish the defendant and his attorney with a copy of same. The defendant must be afforded the opportunity to adduce any testimony which has any probative value that will enable the court to perform its constitutional responsibility for the question of whether a man should live or die is not to be treated as a mere formality.
The trial court is further directed to call before him the juror who on voir dire stated she was a "distant cousin" to the deceased and determine the precise and exact degree of kinship in accordance with the rules of the civil law.
Accordingly, this case is remanded to the Circuit Court of Butler County to make and enter a full and complete written finding as to the aggravating and mitigating circumstances after the hearing is conducted with the defendant and his attorneys present.
The trial court is further directed that a full record be made of this hearing, which should be conducted expeditiously, and a transcript of these proceedings under the Seal of the Clerk be promptly forwarded to this Court. See Seibold v. State, 287 Ala. 549, 253 So.2d 302.
Remanded for further proceedings in accordance with this opinion.
All the Judges concur.

After Remandment
This case was remanded to the trial court to hold another sentencing hearing and to enter "complete written findings as to the aggravating and mitigating circumstances" based upon the trial evidence. The trial court was further ordered to secure a presentence report prior to said hearing and furnish the defendant and his attorney with a copy of same, and to afford the defendant the opportunity to adduce testimony which would have any probative value to enable the Court to perform its constitutional responsibility in determining whether the defendant would be sentenced to death or to life imprisonment without parole. The Court was further directed to call before him the juror who on voir dire stated she was a "distant cousin" of the deceased and determine the precise and exact degree of kinship in accordance with the rules of civil law.
In strict compliance with our order of remand the trial court held another hearing with the defendant and his attorney present. At the conclusion of the hearing the Court made and entered the following written findings:
"This cause was set for hearing pursuant to the opinion of the Alabama Court of Criminal Appeals which ordered this Court to order a pre-sentence report prior to the said hearing and furnish the defendant and his attorney with a copy of the same, and to afford the defendant the opportunity to adduce testimony which would have any probative value and would enable the Court to perform its constitutional responsibility for the question of whether a man should live or die. The Court was also directed to call before it the juror who on voir dire stated she was a `distant cousin' of the deceased and determine the precise and exact degree of kinship in accordance with the rules of civil law.
"The pre-sentence report was ordered by the Court and furnished to the defendant and his attorney and has been considered by the Court.

*502 "The defendant offered no new evidence at the hearing but relied upon the question raised during the trial concerning the defendant's head injury, and the defendant's financial inability to secure medical testimony concerning said injury.
"Upon consideration of the pre-sentence report, the evidence of the crime itself and the defendant's contention concerning his head injury, the Court finds the following aggravating circumstances:
"The defendant has an extremely long prior criminal record including sentences to the penitentiary in the State of New York and the State of Alabama.
"The Court further finds that in the course of the robbery the deceased was cruelly and brutally beaten with a blunt instrument about the head and left in his shop. That in the course of the robbery several weapons were taken by the defendant along with some money from the person of the deceased, and from the store.
"The only mitigating circumstance the Court finds has to do with the defendant's unsubstantiated contentions concerning his head injury. The Court notes that at a suppression hearing the defendant testified to the circumstances surrounding the confessory statements. That the defendant's statements were clear and lucid and he gave no evidence of any mental abnormality. The defendant has a significant history of prior criminal activity. There is no evidence that the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance. The victim of the crime was not a participant in the defendant's conduct, nor did he consent to the act. There is no evidence that the defendant was an accomplice in the commission of this crime. There is no evidence that the defendant acted under extreme duress or under the substantial domination of another person. There is no evidence that the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. That at the time of the commission of the offense the defendant was only 47 years of age.
"The Court therefore finds that there were no substantial mitigating circumstances in connection with this offense and that the aggravating circumstances far outweigh any mitigating circumstances and that the death sentence was warranted under all of the surrounding circumstances.
"The Court also called before it the juror, Myrtice Porterfield, who testified on voir dire that she was a `distant cousin' of the deceased. Upon further examination of said juror she testified that she was a fourth cousin of the deceased on one side of the family and a fifth cousin of the deceased on the other side of her family. The law provides for proving of a grounds for challenge for this cause by oath of the juror. The Court therefore concludes that the juror was not related to the deceased within the prohibited degree and that the challenge was due to be denied.
"It is therefore ORDERED and ADJUDGED by the Court that the challenge of the juror, Myrtice Porterfield, be and the same is hereby denied.
"It is further ORDERED by the Court that the sentence of death previously ordered by the Court be and the same is hereby sustained.
"It is further ORDERED by the Court that the Clerk and the Court Reporter prepare a transcript of this said hearing and forward the same to the Alabama Court of Criminal Appeals.
"It is further ORDERED by the Court that a copy of this Order be furnished by the Clerk to the defendant and his attorney.
"DONE this 28th day of December, 1978.
 /s/ Arthur E. Gamble, Jr.
 CIRCUIT JUDGE"
The presentence report was furnished the defendant and his attorney and was introduced into evidence at the hearing. This report reveals that the defendant served time in the penitentiary in Alabama for *503 burglary and grand larceny. He was convicted in the State of New York of burglary and petty larceny; grand larceny; burglary in the third degree and grand larceny; grand larceny of an automobile; burglary in the third degree, and the possession of dangerous drugs. For the New York convictions he served time in several prisons including Sing Sing. In addition to the above felonies he has run afoul of the law in misdemeanor cases both in Alabama and New York beginning in the year 1953.
We are in full accord with the findings of the trial court and find that they are fully supported by the evidence in this case.
The judgment of conviction is, in all things, affirmed.
AFFIRMED.
All the Judges concur, except BOOKOUT, J., who dissents with opinion.
BOOKOUT, Judge, dissenting:
I am unable to concur in the affirmance of the death penalty based upon the written findings of the trial court furnished this court after remandment. I would again remand to the trial court for additional findings or clarification of the findings dated December 28, 1978, supra.
Concerning the trial court's findings as to aggravating circumstances, I am of the opinion that they fail to meet the strict mandate of the statute which is required in the enforcement of all criminal laws. Finding that the defendant "has an extremely long prior criminal record including sentences to the penitentiary" in Alabama and New York does not comply with § 13-11-6(2), Code of Ala.1975, which requires a finding that the appellant "was previously convicted of another capital felony or a felony involving the use of threat of violence to the person."
The majority opinion states the presentence report reveals that the appellant had served several sentences for burglary, grand larceny, petit larceny, larceny of an automobile, third degree burglary, and possession of "dangerous drugs," (which was listed as a misdemeanor in that report). The majority further points out that the appellant had served time in Sing Sing Penitentiary. Nowhere does the trial judge's findings, nor those of this court, reveal a prior conviction of another capital felony, or a felony involving the use or threat of violence to the person. The statute does not allow a crime against property by stealth to be set out as an aggravating circumstance. Neither does it enumerate as an aggravating circumstance that a defendant served time in a number of penitentiaries, even an infamous one. Likewise, the fact that during the robbery "several weapons" were taken along with "some money" is not an aggravating circumstance listed in the statute.
The finding of the trial court closest to that described in the statute concerns the cruelty of the offense. Section 13-11-6(8) requires a finding that the crime was "especially heinous, atrocious, or cruel." (Emphasis supplied.) The trial court found that during the course of the robbery, "the deceased was cruelly and brutally beaten with a blunt instrument about the head and left in his shop." It is my opinion that the trial court's findings should be in conformity with the strict wording of § 13-11-6(8), supra. Particular attention should be paid to the fact that the legislature, in reinstituting the death penalty, intended that it be exercised in cases which were "especially heinous, atrocious, or cruel." I believe it is imperative that the findings of trial judges in death penalty cases adhere closely to the strict wording of the statute, otherwise there will be a tendency to gradually expand the scope of the statute thereby endangering the constitutionality of its application. I therefore would remand for additional findings by the trial court.