554 So.2d 1094 (1984)
Timothy Charles DAVIS
v.
STATE.
5 Div. 538.
Court of Criminal Appeals of Alabama.
October 9, 1984.
Rehearing Denied December 9, 1986.
*1096 Bruce M. Green and James C. Pino of Mitchell, Green, Pino & Medaris, Alabaster, for appellant.
Charles A. Graddick, Atty. Gen., and Rivard Melson and Edward Carnes, Asst. Attys. Gen., for appellee.
HARRIS, Judge.
Timothy Charles Davis, the appellant herein, was convicted of the capital murder, the intentional killing during a robbery, of Avis F. Alford and the jury, pursuant to § 13-11-2(a), Code of Alabama 1975, fixed his punishment at death by electrocution. The trial court, pursuant to §§ 13-11-3 and -4, Code of Alabama 1975, held a separate sentencing hearing and sentenced the appellant to death by electrocution.
This cause was, originally, reversed on appeal and remanded for a new trial on the authority of Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). Davis v. State, 408 So.2d 532 (Ala.Crim. App.1981), cert. denied, 408 So.2d 533 (Ala. 1982). However, the United States Supreme Court vacated this decision and remanded this cause to us for further consideration in light of Hopper v. Evans, 456 U.S. 605, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982). Alabama v. Davis, 457 U.S. 1114, 102 S.Ct. 2912, 73 L.Ed.2d 1326 (1982). For the reasons herein noted appellant's capital murder conviction must be affirmed.
On July 20, 1978, between 4:30 p.m. and 5:30 p.m., at Alford's Grocery in Coosa County, Alabama, 68-year-old Avis F. Alford was robbed, sodomized, and brutally murdered with a common steak knife. Her *1097 nude body was discovered at approximately 5:30 p.m. inside her store next to the cash drawer counter, where she had been assaulted and stabbed in the back 17 times. The cash drawer was found open. The drawer contained no paper currency, but it did contain a few coins. Other coins were "scattered about" on the floor behind the counter.
An autopsy revealed that Mrs. Alford had, indeed, died from the combination of knife wounds in her back, wounds which punctured her lungs and lacerated her aorta. She had lost a large volume of type "A positive" blood. Further analysis of samples taken during the autopsy revealed the presence of human sperm in the victim's rectum.
Shortly after the murder, the appellant, accompanied by his wife and his mother, appeared at the murder scene and told the authorities that he had discovered Mrs. Alford's body inside the store. He explained that when he realized she was dead, he "got scared and ran." He later explained that in lifting the body he had "gotten blood all over" himself and that he had changed clothes at home before returning to report what he had seen. He also told the officers that on his way home after discovering the body he had seen two black men walking down the highway away from Alford's store. However, when asked for a description of the two black men, the appellant "hemmed and hawed," and could only state that one was tall and one was short.
Mrs. Alford was last seen alive inside the store at 4:30 p.m. A young white male on a motorcycle was seen riding into the parking lot at Alford's Grocery at 5:05 p.m. The description of the motorcycle rider and the motorcycle generally matched the appearance of the appellant and his motorcycle on the day of the murder.
Curtis Smith identified the appellant in court. He testified that on the day of the murder, at approximately 5:30 p.m., he saw the appellant riding his motorcycle at the Covered Bridge a few miles from Alford's store. He saw the appellant ride past the bridge, and he heard the motorcycle stop and "quiet down" for several minutes before the appellant returned to the bridge. The appellant stopped and told Smith that he, the appellant, had "taken a spill" on his motorcycle. The appellant was wearing a brown T-shirt and blue jeans and had blood on his right hand and arm and on his jogging shoes. He was bleeding from underneath one of his fingernails. He "pulled down to the rocks" beside the creek, washed off the blood, and rode away.
During the investigation immediately following the murder, Mrs. Alford's wallet, which had been taken during the robbery-murder, was found in the woods a short distance past the Covered Bridge where Smith had seen the appellant. The investigating officers testified that, after talking with Smith, they drove slowly down the road and found, at the entrance to an old logging road, a disturbance in the dirt of the type a motorcycle would make "spinning out." They searched the area and found the wallet.
Using metal detectors, the investigating officers also found, in the field across the highway from Alford's Grocery, the murder weapon, a steak knife covered with type "A" human blood. Similar knives were seen in the kitchen of appellant's residence.
The results of physical examinations and chemical analyses of the clothes the appellant was wearing at the time Mrs. Alford was murdered, including his motorcycle helmet, were particularly incriminating. Splattered blood was found on his motorcycle helmet and smeared and splattered blood was found on his blue jeans and shoes. Blood was smeared on and around the button and the button hole used to fasten the jeans at the waist. Blood stains were found on the outside and on the inside of the jeans in the waist area. Bloodstains were also found in the area of the right knee and the lower leg. All of the stains of sufficient size to permit typing were type "A" human blood, whereas appellant's blood type is type "O."
A small bloodstain was found on the inside of appellant's undershorts. On the outside of his undershorts in the area of *1098 the crotch there was a large yellowish-brown stain. This stain was a combination of human sperm mixed with fecal matter and human tissue of the type found inside the rectum.
In addition to this overwhelming circumstantial evidence against the appellant, the state presented evidence of an alleged confession by the appellant to Tracy Bignault, a fellow inmate of the appellant during appellant's incarceration prior to trial. Bignault testified that the appellant admitted robbing and killing Mrs. Alford. Bignault related to the jury a detailed account of the crime as it was, allegedly, confessed to him by the appellant. Bignault's testimony was consistent with the state's circumstantial evidence. On cross-examination, however, Bignault admitted that in his original statement to the authorities he had left out many of the details. He explained that he did not tell the authorities the whole truth at that time because he was scared.
Appellant's apparent motive for the crime was presented through the testimony of Steve Colvin. Colvin had sold the appellant the motorcycle the appellant was riding on the day of the murder, but the appellant had not made timely payments for it. At work on the morning of the murder, Colvin told the appellant that he, Colvin, needed some of the money the next day.
The appellant presented a defense in the nature of an alibi. On the day of the murder he was living in his grandmother's home with his wife, his mother, and his grandmother. He had been living there for approximately five weeks. His mother testified that the appellant came home from work at 4:00 p.m. and ate supper with the family as usual. James Richardson, a young black boy in the neighborhood, borrowed appellant's motorcycle shortly after the appellant came home from work and did not return it until 5:15 p.m. The appellant, then, took Richardson home and returned at 5:17 p.m. The appellant left again and returned at 5:40 p.m. He told his mother to call the police because he had found a dead woman inside Alford's Grocery. After she had changed clothes, she immediately drove the appellant back to the store, where the appellant told the authorities what he had seen. On cross-examination appellant's mother admitted that she had never told the authorities about James Richardson, and she could not remember the appellant saying anything about going down to the Covered Bridge before returning home from Alford's Grocery. She also admitted that the family had some knives similar in appearance to the murder weapon, but stated that their knives were not the same size. Some were larger and some were smaller than the murder weapon.
Appellant's theory in defense was that someone else robbed and killed Mrs. Alford, that he got blood on himself when he found her body, and that Bignault was lying and had fabricated appellant's alleged confession in order to "make a deal" with the authorities.
After the jurors had been thoroughly instructed by the trial court, to the satisfaction of both parties, they deliberated for only forty-five minutes before returning a verdict of "guilty as charged." The sufficiency of the evidence to support this verdict is not contested on appeal.
The district court judge who handled several of the preliminary proceedings in this case, including appellant's juvenile transfer hearing, was a brother of one of the assistant district attorneys who participated in some of the same proceedings against the appellant. The appellant contends that the district judge should have disqualified himself in order to protect appellant's rights to "due process and an impartial hearing" and that his failure to recuse himself constituted reversible error. We disagree.
The district court judge's brother, acting in his official capacity as an assistant district attorney, did not have "an interest that could be substantially affected by the outcome of the proceedings[s]," see, Canon 3 C.(1)(d)(ii), Canons of Judicial Ethics, and he was not a "party," see, § 12-1-12, Code of Alabama 1975. Therefore, neither Canon 3 C.(1)(d)(ii), nor § 12-1-12, nor Alabama common law mandated *1099 disqualification of the district judge in either the preliminary hearing or the juvenile transfer hearing. See, generally, Ex parte Clanahan, 261 Ala. 87, 72 So.2d 833 (1954).
In Ex parte Clanahan, the Alabama Supreme Court determined that a circuit court judge was not disqualified in a case where his son-in-law was an attorney for one of the parties in the litigation. The court reasoned that the attorney was not a "party," as that term is used in the general "disqualification" statute, now § 12-1-12, and that he had no interest other than his "pride in the successful outcome" of the litigation. Although Ex parte Clanahan involved a civil suit, the principles espoused therein are equally applicable to the instant case. As in Ex parte Clanahan, the assistant district attorney's "fee" or salary was not dependent upon the result of the litigation, and from aught that appears in the record he had no interest other than his "pride in the successful outcome" of the proceedings.
The appellant argues that his rights were violated due to the inherent bias presented by this case. However, in Alabama there is a presumption that a judge is qualified and unbiased and a person contending otherwise has the burden of proof to overcome the presumption. Schillaci v. State, 347 So.2d 556 (Ala.Crim.App.), cert. denied, 347 So.2d 559 (Ala.1977); Williams v. State, 383 So.2d 547 (Ala.Crim.App.), affirmed, 383 So.2d 564 (Ala.), cert. denied, 449 U.S. 995, 101 S.Ct. 534, 66 L.Ed.2d 293 (1980). In support of his arguments, the appellant has presented no evidence of actual bias and only challenged the district court judge's qualifications in an amendment to his motion for a new trial, filed approximately two years after the district court judge's final action in this cause.
Nevertheless, we have reviewed the record of the preliminary hearing and the juvenile transfer hearing, the two proceedings handled by the district court judge, and have found no evidence, whatsoever, of any bias against the appellant. In fact, the preliminary hearing resulted in an order "releasing the appellant from detention," a ruling favorable to the appellant. The juvenile transfer hearing resulted in an order certifying the appellant as an adult, a result well supported by the evidence.
At appellant's request the trial court held a hearing to consider appellant's motion for treatment as a youthful offender. For aught that appears in the record the appellant was given due consideration for the benefits of the Youthful Offender Act. In denying appellant's motion for treatment as a youthful offender, the trial court considered information from the probation officer's report, information obtained through the trial court's own independent investigation, and information presented by both parties during the hearing. Considering all this information, the trial court denied appellant's request for youthful offender treatment because of the nature of the crime charged, a brutal capital murder, because there was evidence that the appellant had absconded from the state after being released from detention following a preliminary hearing and had to be returned to the state through extradition proceedings, and because there was evidence that the appellant had confessed the crime to a fellow inmate in a Georgia detention facility.
This determination was within the sound discretion, "almost absolute discretion," of the trial court. See, Morgan v. State, 363 So.2d 1013 (Ala.Crim.App.1978). The record contains no evidence, whatsoever, of any abuse of discretion in this cause. The trial court's decision was not arbitrary, but rather was based upon a consideration of many factors revealed during the investigation and examination of the defendant, an investigation and examination "sufficient to enable the judge to make an intelligent determination of whether, in his discretion, the defendant" was eligible for youthful offender treatment. See, Clemmons v. State, 294 Ala. 746, 321 So.2d 238 (1975); Watkins v. State, 357 So.2d 156 (Ala.Crim. App.1977), cert. denied, 357 So.2d 161 (Ala. 1978).
A full, formal hearing was not required. Morgan v. State, supra; Watkins v. State, supra; Prince v. State, 392 So.2d *1100 853 (Ala.Crim.App.1980), cert. denied, 392 So.2d 857 (Ala.1981); Garrett v. State, 440 So.2d 1151 (Ala.Crim.App.1983). Therefore, appellant's contention that the trial court's independent investigation denied him his right to confront witnesses against him is without merit.
The appellant further contends that the trial court erred in denying his motion for a change of venue. He argues that the widespread publicity of the crime mandated a change of venue. We disagree.
Although the appellant presented evidence of numerous newspaper articles covering the crime, the record reveals that these articles were factual and objective in nature and that several editorials even encouraged readers to disregard rumors and withhold their judgments as to appellant's guilt or innocence until after his trial. Consequently, the publicity did not demonstrate "inherent prejudice" against the appellant sufficient to mandate a change of venue. See, Magwood v. State, 426 So.2d 929 (Ala.1983), affirming 426 So.2d 918 (Ala.Crim.App.1982); Robinson v. State, 430 So.2d 883 (Ala.Crim.App.1983). Moreover, the mere passage of time between the crime and the venue hearing, a passage of approximately 14 months in the instant case, was another factor negating the prejudicial effect of the publicity surrounding the instant offense and justifying the trial court's refusal to grant a change of venue. See, Magwood v. State, supra; Robinson v. State, supra.
Furthermore, there was no proof of any "actual prejudice" among the prospective jurors. Those who had heard about the crime could remember very little about it. None, when questioned on voir dire, disclosed any preconceived notions or fixed opinions as to appellant's guilt and all indicated that any prior knowledge would in no way affect their verdicts. The record clearly demonstrates compliance with the juror fairness and impartiality standards espoused in Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). See, Anderson v. State, 362 So.2d 1296 (Ala.Crim.App.1978); Giles v. State, 554 So.2d 1073 (Ala.Crim.App.1984).
Under these circumstances, the trial court's denial of appellant's motion for a change of venue, a decision properly left to the sound discretion of the trial court, was not improper. See, Magwood v. State, supra; Anderson v. State, supra; Moulds v. State, 426 So.2d 942 (Ala.Crim.App.1982).
Contrary to appellant's assertions, the trial court's refusal to order the state, pursuant to appellant's discovery motion, to provide the appellant with the criminal record of each expected witness for the state was not a violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny. In Alabama a defendant is not entitled to the general disclosure of the criminal records of the state's witnesses. Mack v. State, 375 So.2d 476 (Ala.Crim.App.1978), affirmed, 375 So.2d 504 (Ala.1979), vacated on other grounds, 448 U.S. 903, 100 S.Ct. 3044, 65 L.Ed.2d 1134 (1980); Mardis v. State, 423 So.2d 331 (Ala.Crim.App.1982); Wright v. State, 424 So.2d 684 (Ala.Crim.App.1982).
The trial court, after a thorough discussion of all items in appellant's discovery motion, granted many of appellant's requests for discovery and production but chose to deny the request for the criminal records of the state's witnesses. Under these circumstances and in the absence of proof to the contrary, we cannot say that this denial of discovery, a decision within the trial court's sound discretion, was improper. See, Mardis v. State, supra; Wright v. State, supra.
The state was permitted to introduce, through the testimony of two of the investigating officers, the exculpatory statements made by the appellant on the night of the murder but before he was taken into custody. The appellant insists that admissions of these statements violated § 12-15-67, Code of Alabama 1975, which prohibited the use of statements by a child, unadvised by counsel, made to law enforcement officers while in their custody. See also, A.R.Juv.P. 21 (1975).
The state argues, and we agree, that the statements in question were not made while the appellant was in the custody of *1101 the investigating officers. Sergeant James Boggs testified that the appellant and his mother approached Boggs at the murder scene less than an hour after the murder and told him that the appellant had found the victim inside the store, had "gotten scared," and had gone home. Boggs explained that this information was unsolicited and that he immediately introduced the appellant to Sheriff Vernon Peters of the Coosa County Sheriff's Department. He stated that he did not question the appellant, that he did not arrest him, and that at that time he did not consider the appellant a suspect in the murder.
Sheriff Peters testified that he was introduced to the appellant by Sergeant Boggs and that at Boggs's suggestion he took the appellant to a nearby patrol car only because other people at the scene were beginning to crowd around them. He explained that he had no reason to suspect the appellant and had no reason to arrest him at that time. He did not place the appellant in custody. The appellant voluntarily made a statement essentially identical to what he had told Sergeant Boggs. The appellant added that on his way home after discovering the victim inside the store he had seen two black males walking down the highway away from the store. Peters asked him for a description of the two men. The appellant "hemmed and hawed" and reported only that one was tall and one was short. After the appellant had told Peters where he, the appellant, worked and that the clothes he had on were the same ones he had worn to work, Peters asked the appellant how he had managed to keep his clothes so clean. The appellant then "went to crying like" and revised his story about finding the body. He explained that he lifted the body to see if he could help in any way and "got blood all over himself" and then went home and changed clothes. It was at this point that Sheriff Peters became suspicious and he immediately interrupted the appellant and read him his rights. The appellant was then taken into custody. Later that night he was arrested for Mrs. Alford's murder.
There was also evidence that a driver's license check of the appellant was made at some point while the appellant was in the car talking with Sheriff Peters. However, it was not clear from the record when that check was made or by whom it was authorized. Peters testified that he did not authorize it and knew nothing about it until after he had placed the appellant in custody, initially as a key witness in the investigation.
Under these circumstances, essentially uncontradicted in the record, it is our conclusion that the statements made to Sergeant Boggs and Sheriff Peters before Peters read the appellant his rights were not made while the appellant was in custody and, in fact, were exculpatory statements volunteered by the appellant. Compare, Harris v. State, 376 So.2d 773 (Ala.Crim. App.), cert. denied, 376 So.2d 778 (Ala. 1979); Stewart v. State, 398 So.2d 369 (Ala. Crim.App., cert. denied, 398 So.2d 376 (Ala. 1981); Manigan v. State, 402 So.2d 1063 (Ala.Crim.App.), cert. denied, 402 So.2d 1072 (Ala.1981); Cork v. State, 433 So.2d 959 (Ala.Crim.App.1983).
Therefore, the trial court did not err in admitting them into evidence.
Furthermore, appellant's mother, the key witness for the defense, generally confirmed, from the witness stand, the substance of these statements and the circumstances that existed when they were made. Moreover, these statements were exculpatory and were not inconsistent with appellant's theory in defense at trial, that he arrived at Alford's Grocery after Mrs. Alford had been killed and left upon discovering the body only because he was "scared."
The trial court did not err in admitting into evidence the undershorts taken from the appellant on the night of the murder, after he had been officially arrested for Mrs. Alford's murder. Appellant's theory is that his undershorts should have been suppressed as "the fruit" of a statement taken in violation of § 12-15-67. We disagree.
The appellant was originally taken into custody between 6:15 and 6:30 p.m. on the night of the murder. As more and more information was obtained the investigation *1102 focused upon the appellant. He was officially arrested for Mrs. Alford's murder at approximately 9:30 p.m. The appellant, unadvised by counsel, made a custodial statement at 10:05 p.m. That statement was obtained in violation of § 12-15-67 and was, therefore, suppressed by the trial court. At approximately 11:00 p.m., at the request of the same investigating officer who had earlier taken the inadmissible statement, the appellant voluntarily surrendered the undershorts he was wearing, the same undershorts he was wearing when arrested.
Despite appellant's arguments to the contrary we are not persuaded that these undershorts were inadmissible. Although the undershorts were obtained after the inadmissible statement was obtained, the record does not confirm appellant's theory that the undershorts were "the fruit" of that statement. There was evidence that the victim had been sexually attacked. The appellant had previously told the authorities that he had changed clothes after he discovered the victim. The investigators recovered from appellant's residence the clothes he had removed before returning to the scene of the crime. An inventory revealed a T-shirt and blood splattered blue jeans and jogging shoes, but no undershorts. With this information, after the investigation had focused upon the appellant and he had been legally arrested for Mrs. Alford's murder, the authorities were justified in obtaining the undershorts which the appellant was wearing at the time of his arrest. Thomas v. State, 50 Ala.App. 227, 278 So.2d 230 (1973); Turk v. State, 53 Ala.App. 106, 298 So.2d 37 (1974); Foy v. State, 387 So.2d 321 (Ala.Crim.App.1980). Whatever information was revealed in the inadmissible statement, there was sufficient independent information to justify the request for appellant's undershorts.
There is no merit whatsoever in appellant's argument that he was arrested illegally.
There is, likewise, no merit in appellant's arguments concerning the admissibility of the clothing he was, allegedly, wearing when he discovered the victim, and his motorcycle helmet, and testimony describing his motorcycle. Appellant's arguments that this evidence was illegally obtained are not supported by the facts or the applicable law. Appellant's grandmother gave the investigating officers appellant's T-shirt and blue jeans outside on her front porch and she consented to the search of her home, including the bedroom in which the appellant had been sleeping, which resulted in the discovery of the jogging shoes. Compare, Hawkins v. State, 333 So.2d 846 (Ala.Crim.App.1976), cert. denied, 333 So.2d 851 (Ala.1976). The motorcycle helmet and the motorcycle were in plain view in the front yard of appellant's grandmother's home. The helmet, and the testimony concerning the motorcycle were, therefore, admissible. See, Franklin v. State, 357 So.2d 364 (Ala.Crim. App.), cert. denied, 357 So.2d 368 (Ala. 1978); Dannelley v. State, 397 So.2d 555 (Ala.Crim.App.), cert. denied, 397 So.2d 577 (Ala.1981), cert. denied, 454 U.S. 856, 102 S.Ct. 305, 70 L.Ed.2d 151 (1981); Teat v. State, 409 So.2d 940 (Ala.Crim.App.1981).
We have thoroughly reviewed the evidence concerning the chain of custody of the victim's body, the samples of the victim's blood, and the swabs taken from the victim's rectum, and have concluded that there was absolutely no evidence of any "tampering" with the body, the blood samples, or the swabs, and that the chain of custody for each was sufficiently established. The relevant testimony concerning this evidence was, therefore, properly admitted. Williams v. State, 375 So.2d 1257 (Ala.Crim.App.), cert. denied, 375 So.2d 1271 (Ala.1979).
The appellant contends that he is entitled to a new trial because of the existence, in the statute under which he was tried and convicted, of the "preclusion clause," a clause which precluded trial courts from instructing juries on possible lesser included offenses. See, Hopper v. Evans, 456 U.S. 605, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982). Appellant's arguments are essentially the same as those raised, and decided *1103 adversely to the defendant, in Cook v. State, 431 So.2d 1322 (Ala.1983).
Cook established a two-prong test for determining when the existence of the preclusion clause entitles a defendant to a new trial:
"(1) Was there any evidence presented at trial upon which a conviction of a lesser included offense could have been based?
"(2) If not, has the defendant suggested any plausible claim which he might conceivably have made, had there been no preclusion clause, that is not contradicted by his own testimony at trial?"
Negative answers to these two questions require an affirmance of the trial conviction.
In the instant case it was uncontroverted at trial that Mrs. Alford was the victim of a cold-blooded, brutal murder, perpetrated during a robbery and that she was also sexually molested. There is no evidence and no theory from the record which would point to a lesser included offense. So the answer to the first prong of the Cook test is "no." Furthermore, although the appellant argues in brief that his trial strategy might have been different without the preclusion clause, he has presented no "plausible claim" or theory upon which a conviction for a lesser included offense might have been based. His only defense at trial was alibi,[1] presented through the testimony of his mother. Consequently, the answer to the second prong of the Cook test is also "no." Therefore, on the authority of Cook, the appellant is not entitled to a new trial because of the existence of the preclusion clause. See, Hopper v. Evans, supra.
The remaining guilt phase issues are without merit. The issues presented are frivolous and the errors complained of were not prejudicial to the appellant.
Appellant's capital murder conviction must, therefore, be affirmed.
See Appendix.
AFFIRMED.
All the Judges concur.

APPENDIX

STATE OF ALABAMA

VS.

TIMOTHY CHARLES DAVIS, DEFENDANT

CRIMINAL CASE NO. CC-79-012

IN THE CIRCUIT COURT OF COOSA COUNTY, ALABAMA

ORDER OF COURT ON IMPOSITION OF THE DEATH PENALTY
The Defendant in this case, Timothy Charles Davis, was charged by indictment of the Coosa County Grand Jury with the robbery of Avis F. Alford and during the course of said robbery that he did intentionally kill Avis F. Alford. This charge is brought under the provisions of the Alabama Death Penalty Act, Code of Alabama, 1975, Section 13-11-1, et seq.
The case came on to be heard before the Court and a jury of twelve men and women duly empanelled and sworn as required by law; whereupon, the jury, after hearing the evidence, the Court's charge as to the applicable law, and upon consideration of the law and evidence, found the defendant guilty as charged in the indictment and fixed his punishment at death.
The Court announced the Jury's verdict and set July 14, 1980, as the date for presentment to the Court, of evidence and argument as to aggravating and mitigating circumstances and other matters that could be lawfully considered toward determination of sentence by the Court.
On the 14th day of July, 1980, at 10:00 a.m. in the Court Room of the Coosa County Courthouse at Rockford, the Court proceeded to hear and consider matters in accordance with law toward determination *1104 of whether the death penalty or life imprisonment without parole should be imposed on the defendant, Timothy Charles Davis.
The Court was open. The defendant, his trial counsel and the State's attorneys were present and ready to proceed.

THE LAW
Subsequent to the trial of this case but prior to the sentencing hearing, the Supreme Court of the United States rendered a decision in Beck v. State of Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392.
At the sentence hearing in the present case the State argued that Beck was inapplicable. The defendant took the opposite view. This Court ruled that Beck did not apply and stated the basis for the ruling more specifically as follows:
The decision in Beck was based upon the following question:
"May a sentence of death constitutionally be imposed after a jury verdict of guilty of a capital offense, when the jury was not permitted to consider a verdict of guilty of a lesser included non-capital offense and when the evidence would have supported a verdict?"
The Supreme Court held that the death penalty may not be imposed under such circumstances.
Beck had testified at his trial admitting his participation in the robbery of the victim but denying any prior knowledge that his accomplice would kill or attempt to kill the robbery victim. Beck offered testimony which rebutted the element of "intentional" killing on his part. This testimony could have supported a charge by the trial judge to the jury of a lesser included offense in a non-capital case under Alabama law.
The present case is dissimilar in these particulars in that the defendant, Davis, during his trial offered only the defense of alibi. The most cogent part of such alibi evidence was presented by the defendant's mother during her testimony as a witness for the defendant. Her testimony of alibi had little weight and stood rather poorly the test of the State's cross examination. That the killing during the robbery was either accidental or unintentional was not a part of the evidence offered by the defendant or by the State: to the contrary, the evidence was without dispute that the victim of the robbery was intentionally killed during the course of the robbery.
The defense of alibi is inconsistent with almost any other theory of defense since it is an unqualified denial of guilt. It is particularly inconsistent with what is commonly known as a "confession and avoidance" defense which frequently results in the necessity of an instruction by the Court to the jury of some lesser included offense. The defendant, Davis, here claims that he could not have committed the capital felony because he was not physically present at the place of the crime; therefore, upon a consideration of all the evidence, only two choices could be available for the jury's consideration: (1) He was guilty of committing the capital offense of robbery when the victim is intentionally killed by the defendant; or (2) he was not guilty because he was someplace else.
The legal consequence of this is that there was no evidence offered during this trial which would have authorized the trial judge to instruct the jury as to any lesser included offense. This would be correct even if our statutory law provided for such instruction since for the instruction to be given the trial evidence must support such instruction.

FINDINGS OF FACT FROM THE TRIAL
Mrs. Avis F. Alford, an elderly white woman, ran a grocery store near the defendant's residence on what is known in the community as Fishpond Road. Late in the afternoon of July 20, 1978, her friend, Mrs. Linnie C. Neighbors left Mrs. Alford alive and well, but alone in her store. A short while later another lady made a purchase at the store and she too left Mrs. Alford alive and well, but alone.
A short time later a Mr. Robbins observed a young white male, with a beard, riding a gold colored motorcycle and wearing *1105 a gold colored helmet. He also noticed that the rider had long light colored hair sticking out from under the helmet. He was wearing jeans and a t-shirt. He turned into Mrs. Alford's store off Fishpond Road. Some twenty to thirty minutes later a Mr. Johnson saw a young white male with a beard, on a gold colored motorcycle wearing a gold colored helmet, with long light colored hair sticking out from under his helmet. He was traveling at a high rate of speed from the direction of Mrs. Alford's store, down Fishpond Road toward its intersection with the Covered Bridge Road. The Covered Bridge Road is so named for the type of bridge on that road crossing a small creek. It is a dirt road. The bridge, its road, and that road's intersection with the Fishpond Road is a relatively short distance from the Alford store.
Near the bridge and on the bank of the creek, a Mr. Curtis Smith was tending to his bodily functions while his friend was in a car nearby in a semiconscious alcoholic stupor. Smith heard a motorcycle on the Covered Bridge Road and looking up he saw a young white bearded male, whom he later identified as the defendant, Timothy Charles Davis, riding a gold Honda motorcycle, wearing a gold colored helmet, with his hair sticking out from under the helmet. He was dressed in jeans, a t-shirt and tennis shoes. Smith watched the defendant cross the bridge and disappear from sight. He noticed the sound of the motorcycle as the defendant rode the motorcycle a short distance up the road. He heard the engine sound as if it were racing. Moments later the defendant returned on the motorcycle, came across the bridge and stopped at the edge of the creek where Smith was standing. Smith had a conversation with the defendant at the creek as the defendant washed his hand and arm of what appeared to Smith to be blood. The defendant told Smith that he had "had a spill" with the motorcycle, indicating the reason for the blood on his arm and hand. The defendant left Smith and rode his motorcycle back toward Fishpond Road.
During the time the defendant was at the creek or a short time thereafter, a Mr. Gene Harris, who was then a candidate for Road Commissioner, was canvassing houses along Fishpond Road. He stopped at the Alford store. When he entered the store, he found the body of Mrs. Alford. She was lying face down in a pool of blood and was nude except for her shoes and ankle type stockings. She appeared to be dead. The Coosa County Sheriff's Department and other law enforcement agencies were summoned to the scene. A cordon was immediately established and the scene and body were properly preserved for the ensuing investigation.
Mrs. Alford's body was later examined during an autopsy by Dr. Joseph Embry, a forensic pathologist. He determined that she died as a result of seventeen (17) exterior and eighteen (18) interior stab wounds to her upper left back. In addition, he found in her rectum a soft stool or feces. From this same area he took an anal swab, turning it over to the forensic criminalist Lawden Yates for analysis. On this anal swab Yates found the presence of semen and sperm.
Mrs. Alford's clothes were recovered completely intact, without blood stains, a short distance from her body. The cash register of the store was empty, and Mrs. Alford's brown leather wallet, the approximate value of twelve dollars ($12), was missing.
During the course of the immediate investigation, two State Troopers, Officers Cribbs and Tapley, interviewed Mr. Smith, learned of the defendant's actions on the Covered Bridge Road, and crossed the bridge following the route the defendant took. A short distance beyond the bridge they discovered a spin-rut off the side of the road, appearing to have been made by a motorcycle. They investigated the area near the rut and discovered what appeared to be another motorcycle spin-out or "spin-around," a short distance from the first. Near this second point, they found Mrs. Alford's missing wallet containing several checks made payable to her store.
*1106 A short time after the Sheriff and other law enforcement officers arrived at the scene, the defendant came to the scene of the crime accompanied by members of his family. They expressed a desire to talk to some of the officers, and either the defendant or his mother stated to Sgt. Boggs, a State Trooper, that the defendant had discovered Mrs. Alford's body in the store. The defendant was then interviewed by the Coosa County Sheriff, Vestin Peters. The defendant first told Peters that he had found Mrs. Alford's body on the floor in the store, after further questioning, the defendant admitted changing his clothes before he came to the scene to talk to the officers, and stated that the reason he had done so was because he lifted her body and had gotten blood on his other clothes. At this time the defendant was held as a material witness.
Timothy Charles Davis was later arrested and charged with robbery and the intentional killing of Mrs. Avis F. Alford. The arrest came after Deputy Sheriff Neighbors obtained from the defendant's residence tennis shoes, blue jeans and motorcycle helmet all spattered with what appeared to be blood. After his arrest, the defendant's underwear (jockey type shorts) were seized. The day following the robbery and intentional killing of the victim, and following the discovery of Mrs. Alford's wallet, an aluminum handled kitchen knife was found a short distance from the front door of the Alford store. The knife blade was bent and it was believed to be the knife used in the intentional killing of the victim.
During the early part of the investigation, Deputy Neighbors went to the residence of the defendant's grandmother. Her home was also the residence of the defendant. The grandmother admitted Deputy Neighbors and gave him the opportunity of looking through the house. He noticed two similar aluminum handled kitchen knives, one longer and one shorter in length than the one found at the Alford store. The existence of these similar knives was confirmed during the trial by the defendant's mother.
All physical evidence in the case, including: samples of the victim's blood, the knife, the wallet and its contents, samples of the defendant's blood, his jeans, underwear, tennis shoes, and motorcycle helmet were submitted to the Alabama Department of Forensic Science for analysis. That analysis produced the following results.
(1) As to the knife, criminalist William H. Landrum described it as a typical kitchen knife often existing as one of a set, and found the presence of type A blood on the blade. Dr. Embry found the knife, by its length, width, and shape to be consistent with the weapon used to inflict the stab wounds on Mrs. Alford's back. He especially noted a wound in which her spinal cord had been struck and noted the "bent" shape of the knife blade, stating that such a "bend" would be compatible with such a blow.
(2) The victim's blood was typed as being A, Rh positive, MN, by Mr. Landrum. The defendant's blood was typed by Landrum as O, MN.
(3) As to the helmet, Mr. Landrum found spots of blood across the top front portion, but in an insufficient amount to type or classify further. As to the tennis shoes, Landrum found blood spots, type A, MN, on the toe area and on the bottom of the shoes.
(4) As to the jeans, Landrum found blood spatters across the front portion of the legs. He also found smeared blood stains around the buttonhole above the zipper, along the right front edge at the waist on both the interior and exterior, and on the inside of the right front pocket. The type of blood at the waist area, he found to be A, MN. Landrum noted that the smeared blood stains on the waist and around the buttonhole area were consistent with those a person would make pulling up his pants and fastening the button with a bloody right hand.
(5) As to the underwear, Landrum found a smeared blood stain on the top right side at the waist, situated so as to be consistent with that found in the same area of the jeans, and also consistent with those stains *1107 a person would make pulling up his underwear with a bloody right hand. Landrum also found on the front of the underwear the presence of semen, sperm, fecal material, and epithelial cells. The latter he described together as coming from a rectum.
All the blood stains found by Landrum which could be typed and/or classified were consistent with the blood of the victim. None were found to be consistent with that of the defendant.
Prior to the robbery and intentional killing of Mrs. Alford, the defendant purchased a gold Honda motorcycle from one of his fellow employees, his name was Steve Colvin. The defendant promised payment for the motorcycle at some future date. While the defendant and Colvin were at work during the day of July 20, 1978, Colvin told the defendant that he had to have payment for the motorcycle on the next day because he planned to be married during that weekend and needed the money. The defendant promised Colvin to pay what he owed him on the motorcycle the next day, which was the day after the robbery and intentional killing of Mrs. Alford.
After the charge was placed against the defendant and before this case was tried in the Circuit Court, the defendant made a trip to the State of Georgia and while there became incarcerated in a Georgia Juvenile Detention Facility. While he was there he became acquainted with a fellow juvenile inmate named Tracey Bignaught. The defendant, Timothy Charles Davis, told Bignaught about the crime and described to him many details of how he committed the robbery and the sodomy on Mrs. Alford and how he intentionally killed her during the robbery.
In consideration of all the legal evidence of this trial, this Court makes specific findings of fact that the defendant, Timothy Charles Davis, committed robbery of Mrs. Alford of her billfold during the course of which he committed the act of sodomy on her and that he intentionally killed her by stabbing her with a knife. This Court is satisfied from such evidence, beyond a reasonable doubt and to a moral certainty, that this defendant is guilty of the offense charged against him in the indictment.

FINDINGS OF FACT FROM THE SENTENCE HEARING
In view of this Court determining that the case of Beck v. The State of Alabama, 447 U.S. 625, 100 S.Ct. 2382, supra, is inapplicable to the present case, the Court proceeded with the sentencing hearing by giving opportunity to the defendant to present evidence and circumstances in mitigation of the death penalty and to the State to present aggravating circumstances in support of the death penalty.
For the purpose of this sentence hearing, the State requested the Court to take judicial knowledge of the trial, its records and evidence, the juvenile records of the defendant and the reports of the lunacy commission based upon that commission's examination of the defendant while he was at the Bryce Hospital in Tuscaloosa during the summer of 1979. The Court takes judicial knowledge of all such records. The Court also considers the presentence Investigation Report.
The Court accepts the stipulations of the State and defendant that the defendant was 17 years of age and was married at the time the offense was committed, and that the defendant had no significant history of prior criminal activity.
In addition to the mitigating circumstances of age of the defendant and no significant history of prior criminal activity, the defendant presented to the Court that the capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance, and that the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. The defendant also raises the State's willingness to recommend life imprisonment without parole in exchange for a plea of guilty.
The Court finds that while the chronological age of the defendant was 17 at the time of the offense, his activities gave signs of young adulthood in several aspects. *1108 He had acquired a job at the Russell Mills Corporation Distribution Center where he accepted responsibility for the handling of cloth goods manufactured by that company. He purchased a motorcycle from a fellow employee and operated the vehicle on the public streets and highways. He had recently married Pamela Shaffer. He had held two other jobs prior to locating in Coosa County. His general appearance during the trial was somewhat typical of a nineteen year old man. He exhibited interest in the proceedings during the early days of the trial. He communicated freely with his counsel; however, as the trial proceeded, his interest seemed to diminish. He displayed little emotional reaction. The Court finds defendant's age is a mitigating circumstance.
The Court finds by stipulation of the parties that the defendant has no significant history of prior criminal activity and the Court considers this along with all the other enumerated mitigating circumstances.
The defendant presented to the Court that the capital felony was committed while the defendant was under the influence of extreme mental and emotional disturbance. The Court finds from the juvenile records of the Coosa County Juvenile Court that from July 20-21, 1978, and for some period of time thereafter, the defendant was under the supervision of Michael Smith, the Juvenile Probation Officer. This probation officer had opportunity to be with the defendant and the records reflect that his observation of the defendant's demeanor was that he was a controlled and talkative individual, that he exhibited basically even temperament with other juveniles and staff at the Coosa Valley Detention Center. He participated in group activities, although he seemed to prefer staying to himself. His behavior as to the extent and nature of his physical and mental maturity seemed to be typical of persons in his age group. He appeared to know right from wrong, and he appeared to understand the consequence facing him. He was in the lower normal range of intelligence and seemed to be normally developed physically for his sex and age. The report further reflects that the defendant did not appear to be physically or mentally deficient for his age. The Court does not find the existence of such mitigating circumstance.
Next, the defendant states to the Court that the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. The Court finds from the mental and psychological examinations, that were given at the Forensic Unit of the Bryce Hospital during the months of May and June, 1979, when the defendant was ordered there by the Circuit Court for the purpose of an evaluation, that the following reports reflect the medical opinions of those persons who conducted the examinations at Bryce Hospital. Doctor Thomas Smith, a Psychiatrist, states in his report that the defendant's judgment and insight are fair, that his memory is fair, calculations are fair and general information store is within expected range. Doctor Smith's further impression was that the defendant was a reactive depression neurotic.
Doctor Thompson says in his report and evaluation that he cannot see the defendant as being schizoid or withdrawn. He could not see any evidence at that time of any possible amnesia or fugue states. He said further that he thought the defendant was competent, and that he was competent at the time of his charges. He further said that he, as far as his diagnosis was concerned, thought that the defendant was unstable and immature.
The examination of the defendant by a psychologist with the aid of certain psychological tests was the basis for the report signed by Patricia Anne Larkin, a Psychologist, and approved by Dr. Seger, also a Psychologist. She states in her report that Mr. Davis was an alert, oriented, cooperative adolescent who, despite his emotional ability, was able to attend to test tasks and had no difficulties in understanding and following directions. That he had a Full Scale IQ of 88, and that from all the findings from the battery of tests performed *1109 with him and by him, he was considered within the average range of persons his age.
Next, the report of Dr. Nagi, found that the defendant was functioning intellectually within the average range. That his abstract thinking was okay. His memory, recall and retention were not impaired. He was oriented as to time, person and place. And his fund of general knowledge was average. He was defensive, anxious, slightly depressed, but his judgment and insight were fair. He further said that Mr. Davis does not seem to be suffering from mental illness, and was in his right mind at the time the crime was committed. The Court does not find that this mitigating circumstance exists.
The defendant also raises the State's willingness during the trial to recommend to the Court life imprisonment without parole in exchange for a plea of guilty.
The Court finds that such discussions did take place between the State and defendant's counsel. Initially the discussions were had after the high mark of the State's case was reached by the admission of a series of evidence placing the defendant at the scene of the crime when the crime was committed. Defendant's counsel approached the State brought forward an offer to plead the defendant guilty. They asked the State to talk to the victim's family. They did. The response of the family, principally, two adult daughters, was that they would not object if it meant the trial would stop thereby avoiding further trauma associated with the heinousness of the crime. When this was communicated to the defendant and some members of his family, the defendant was not willing to enter a plea. The trial proceeded with the jury having no awareness of these discussions. The Court did not actively participate in the negotiations.
This Court recognizes that defendant's counsel felt a duty to enter into such a plea discussion as part of a competent representation of their client. This Court also recognizes that it had no obligation to be bound by such a recommendation if it had in fact been made. The Court does not find this a mitigating circumstance.
The Court considered then as it does now that it is the sole responsibility of the Court to determine from all the matters that may be duly considered whether the defendant's punishment shall be life imprisonment without parole or the death penalty.
The State presents to the Court the aggravating circumstance that the capital felony was especially heinous, atrocious or cruel. The Court finds that the commission of the crime of robbery by the defendant on the victim coupled with the intentional killing of the victim during the course of the robbery by stabbing her 17 times as she lay face down on the floor of her store, and that such stabbing occurred during or just after the defendant had committed the act of sodomy on the victim is especially heinous, atrocious or cruel.
This Court recognizes that the jury verdict in this case is essentially the pronouncement of the defendant's guilt based upon the trial evidence. The Court does not in any manner whatsoever consider that the verdict or its language is demand to the Court for the imposition of the death penalty but to the contrary, it is this Court and not the jury that must hear, consider and find mitigating and aggravating circumstances and make the final determination at the trial Court level as to the imposition of the death penalty or life imprisonment without parole.

ON APPLICATION FOR REHEARING
McMILLAN, Judge.
On October 9, 1984, this court issued an opinion which affirmed the appellant's conviction of capital murder but did not address the validity of the sentence of death imposed upon the appellant. On October 17, 1984, the appellant filed an application for rehearing, raising no issues which were not addressed on appeal. On October 17, 1984, the State also filed an application for rehearing requesting that this court address the issue of the validity of the appellant's death sentence. Subsequent to the filing of the application for rehearing, the State *1110 also filed a motion requesting that this court hold any further decision in this case in abeyance pending a decision to be announced by the United States Supreme Court. The motion was granted by this court and on June 17, 1985, the United States Supreme Court announced its decision in Baldwin v. Alabama, 472 U.S. 372, 105 S.Ct. 2727, 86 L.Ed.2d 300 (1985). Having in our previous opinion of October 9, 1984, held that the appellant's conviction was proper, we now review the sentencing procedure and the propriety of the imposition of the death penalty, along with the consideration of the effect of Baldwin v. Alabama, supra, on the decision in this case.
The scope of our review in death cases is set out in Rule 45A, Alabama Rules of Appellate Procedure as follows:
"In all cases in which the death penalty has been imposed, the court of criminal appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
In the instant case, we have followed this standard and find that there is no "plain error or defect" in the proceedings, either during the guilt phase or the sentencing phase of the trial.
Additionally, under the three-pronged analysis of Beck v. State, 396 So.2d 645 (Ala.1980), we make the following additional findings: First, the appellant was convicted of the offense of capital murder wherein the intentional killing occurred during a robbery, in violation of § 13-11-2(a), Code of Alabama (1975). Second, the imposition of the death penalty has been applied to similar crimes in other cases. See, for example, Floyd v. State, 486 So.2d 1309 (Ala.Cr.App.1985) (on return to remand); Thomas v. State, 460 So.2d 207 (Ala.Cr.App.1983), aff'd, 460 So.2d 216 (Ala.1984); Waldrop v. State, 459 So.2d 953 (Ala.Cr.App.1983), aff'd, 459 So.2d 959 (Ala.1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 323 (1985); Luke v. State, 444 So.2d 393 (Ala.Cr.App.), aff'd, 444 So.2d 400 (Ala.1983), cert. denied, 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 846 (1984); Dunkins v. State, 437 So.2d 1349 (Ala.Cr.App.1983). As this court in Floyd, supra, noted, "two-thirds of the death sentences imposed in Alabama are in cases of robbery-murder," citing, Thomas v. State, 460 So.2d at 225. In the present case, there were no accomplices or co-defendants. Third, our independent weighing of the aggravating and mitigating circumstances convinces us that the sentence of death, in this case, is appropriate. After the trial court conducted a sentencing hearing, the trial court entered a written order based upon the evidence presented at trial, as well as the evidence presented during the sentencing hearing and in the pre-sentence investigation report.
In its finding of facts, the trial court found as mitigating circumstances the fact that the appellant had no significant history of any prior criminal activity and was 17 years old at the time of the offense. Although the appellant was 17 years old at the time of the brutal crime, the trial court found that the appellant's everyday demeanor was that of an adult, in that he had accepted the responsibilities of marriage, was participating in full time employment, and had accepted the responsibility of operation of a motor vehicle. The additional non-statutory "mitigating circumstance" that the appellant argued was applicable is deemed by us to be a non-mitigating circumstance; specifically he argued the State's willingness during the trial to recommend life imprisonment without parole in exchange for a plea of guilty. The trial court also found that the capital felony was particularly heinous, atrocious, or cruel because, during the commission of the crime of robbery, the appellant intentionally killed the elderly female victim by stabbing her 17 times with a kitchen knife as she lay face down on the floor and the stabbing occurred during or just after the time that the appellant had committed the act of sodomy on his victim. After examining the *1111 aggravating and mitigating circumstances, as required by law, the trial court concluded that the aggravating circumstances outweighed the mitigating circumstances and sentenced the appellant to death.
The findings and conclusions of the trial court concerning the aggravating and mitigating circumstances are fully supported by the evidence in this case. We concur with the trial court that the aggravating circumstances far outweigh the mitigating circumstances and that the death sentence is the appropriate punishment in this case.
In Baldwin v. Alabama, the United States Supreme Court specifically held that no constitutional infirmity exists where the trial court's sentencing order affirmatively sets out that the court did not consider the jury's mandatory sentence as a factor in favor of imposing the death sentence. 472 U.S. at 384, 105 S.Ct. at 2735. In this case, the trial court expressly stated in its sentencing order that it was the trial court's responsibility, not the jury's, to consider and make a final determination of whether the death penalty or life imprisonment should be imposed. Thus, under Baldwin, the imposition of the death sentence was, in all respects, proper.
Noting that this offense occurred in 1978 and falls under the guidelines of Beck, we will, however review the sentence for consideration of the provisions of § 13A-5-53(b), and we specifically find as follows: (1) There is nothing in the record to indicate that the sentence of death was imposed as a result of the influence of passion, prejudice, or any other arbitrary factors; (2) after an independent weighing of the aggravating and mitigating circumstances, this court is convinced that the sentence of death is the proper sentence; and (3) the sentence of death is not excessive, nor is it disproportionate to the penalty imposed in similar cases.
After a careful review of the record on appeal, and considering both the guilt and the sentencing phases, we have found no error. For this reason, the appellant's conviction and sentence of death are affirmed.
OPINION EXTENDED; APPLICATION FOR REHEARING OVERRULED.
All the Judges concur.
NOTES
[1] See, Hill v. State, 455 So.2d 930 (Ala.Crim.App. 1984), for a concise explanation of what constitutes an "alibi" defense.